**SUN REFINING AND MARKETING COMPANY, formerly Sun Oil Company of Pennsylvania, Appellee,**

v.

**Pat J. RAGO, Appellant.**

**No. 83–5844.**

United States Court of Appeals, Third Circuit.

Argued June 15, 1984.

Decided Aug. 23, 1984.

M. Allan Vogelson (argued), Supnick, Mitnick, Vogelson, Josselson & DePersia, Haddonfield, N.J., On the Brief Betty M. Belafsky, Cherry Hill, N.J., for appellant.

Edward C. Laird (argued), Archer & Grenier, Haddonfield, N.J., for appellee.

Before SEITZ and ADAMS, Circuit Judges, and STEWART, Associate Justice[*].

---

* Honorable Potter Stewart, Associate Justice (Retired) of the Supreme Court of the United

States, sitting by designation.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal arises from a declaratory judgment action by Sun Refining and Marketing Company (Sun) to terminate franchise agreement under which Pat Rago operated a Sunoco Station. The district court determined that defendant Rago had breached the agreement with Sun by violating a clause which incorporates the protections and duties of franchisees under Title I of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. (1982).[1] For the reasons set forth herein, we affirm the judgment of the district court in favor of Sun.

### I.

Rago operated a Sunoco station in Bellmawr, New Jersey, for eight years, under a franchise agreement with Sun. The terms of the franchise were contained in two contracts, one covering Rago's lease of the station premises and the other governing Rago's use of the Sunoco trademark, products and equipment. Both contracts contained a provision incorporating by reference the grounds for termination or nonrenewal of the franchise set forth in the PMPA. The contracts were last renewed for the period of June 1, 1980 to May 31, 1983.

On June 19, 1981, two years before the stated expiration of the contracts, Sun sent Rago a certified letter informing him of its intent to terminate the franchise as of October 1, 1981. The letter asserted that Rago's failure to operate the station for the period from April 11 to April 20, 1981, and Rago's failure to pay rent and other sums due Sun in a timely manner were grounds for termination of the franchise under § 2802(b)(2)(C) of the PMPA.[2] When Rago refused to relinquish possession of the station premises, Sun filed suit in the federal district court in New Jersey seeking a declaratory judgment of its right under the PMPA to terminate the franchise.[3] Sun's original complaint cast this

1. All references herein to the Petroleum Marketing Practices Act (PMPA) pertain only to Title I. Title II, which refers to octane disclosure, and Title III, which refers to motor fuel subsidization, are inapplicable to this case.

2. Section 2802(b)(2)(C) of the PMPA allows termination or nonrenewal of a franchise relationship based on:

   The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—
   (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 104(a) [15 USC § 2804(a) ]; or
   (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 104(b)(1) [15 USC § 2804(b)(1) ].

   The above section must, however, be read in conjunction with what follows in § 2802(c), which states:
   As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the

franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as

   \*      \*      \*      \*      \*      \*

   (8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled:
   (9) failure by the franchisee to operate the marketing premises for—
   (A) 7 consecutive days, ....

3. The enforcement provisions of the PMPA are set forth in § 2805, which reads in part:
   (a) If a franchisor fails to comply with the requirements of section 102 or 103 [15 U.S.C. §§ 2802 or 2803], the franchisee may maintain a civil action against such franchisor.
   \*      \*      \*      \*      \*      \*
   (b)(1) In any action under subsection (a), the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 102 or 103, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.
   The Act is silent as to whether a franchisor can seek a declaratory judgment of its right to termi-

action as one arising under the PMPA and asserted the district court had jurisdiction pursuant to 15 U.S.C. § 2805. While that section grants a private cause of action to franchisees, it is silent as to the right of franchisors to bring suit. The district court assumed jurisdiction under § 2805, but later allowed Sun to file an amended complaint recasting its action as one brought under the court's diversity jurisdiction, 28 U.S.C. § 1332 (1982), thus curing any jurisdictional defect in the original complaint.

Just prior to the date set for trial of this matter, Sun filed a motion for partial summary judgment. The district court granted Sun's motion on the ground that either Rago's delinquent payments or his closing of the station allowed Sun to terminate the franchise under § 2802(b)(2)(C) of the PMPA. Rago was then ordered to vacate the station premises. Sun subsequently agreed to dismiss its remaining claims for damages, and on October 24, 1983 the district court entered final judgment. Shortly thereafter Rago filed this appeal.

## II.

### A.

The PMPA was enacted in 1978 in recognition of "the disparity of bargaining power which exists between the franchisor and the franchisee" in the gasoline industry. S.Rep. No. 731, 95th Cong., 2d Sess. 17, U.S.Code Cong. & Admin.News 1978, pp. 873, 877.[4] The Act "establishes protection for franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises," id. at 15, by imposing two requirements on franchisors. First, the franchisor may terminate a franchise only for certain statutorily prescribed grounds.

15 U.S.C. § 2802. Second, the franchisee must be given adequate notice of the franchisor's intent to terminate the franchise. Id. § 2804. The Act creates a private right of action for franchisees who have been subject to unlawful termination or nonrenewal of their franchise. Id. § 2805. In keeping with the Act's acknowledgment of the inferior economic and bargaining position of the franchisee, the franchisor who wishes to terminate or not renew a franchise has the burden of proving compliance with all the statutory requirements of the PMPA. Id. § 2805(c). Additionally, the Act allows franchisees to obtain a preliminary injunction upon a lesser showing than is usually required. Id. § 2805(b). The effect of the PMPA thus is to create a presumption that any termination of a franchise is unlawful.

■ In granting Sun's motion for partial summary judgment, the district court declared that the explanations offered by Rago for failing to keep the service station open in April, 1981 were irrelevant to determining whether Sun had complied with § 2802(c)(9)(A) in terminating Rago's franchise. The district court also rejected Rago's argument that Sun should not be allowed to rely on § 2802(c)(8) in terminating the franchise because its longstanding practice of accepting late payments meant that Sun had waived this particular ground for termination, or that requiring timely payment was not Sun's standard marketing practice, or that late payment was not relevant to the franchise agreement and hence was not a reasonable ground for termination. Because § 2802(c) lists events which are "relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable," the district court stated that "only events which are

---

nate a franchise. However, we need not decide this issue because Rago did not raise it as an affirmative defense pursuant to Fed.R.Civ.P. 8(c).

4. The PMPA was passed after five years of debate and hearings in which Congress heard "[n]umerous allegations ... that terminations and non-renewals, or threats of termination or non-renewal, have been used by franchisors to

compel franchisees to comply with marketing policies of the franchisor." S.Rep. No. 731, 95th Cong., 2d Sess. 14, U.S.Code Cong. & Admin. News 1978, p. 874; see Petroleum Marketing Practices: Hearings on H.R. 130 (and all similar and related bills) before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977).

not enumerated in [§ 2802(c)] must be scrutinized for reasonableness." The effect of the district court's ruling was to make any late payment or any closing of a service station for more than seven days per se grounds for terminating the franchise, regardless of the franchisee's reasons for these actions. We find such an implacable interpretation of §§ 2802(c)(8) and (9)(A) at odds both with other provisions of the PMPA and with the remedial legislative purpose of the Act.

Under 15 U.S.C. § 2801(13), the definition of "failure" under the PMPA specifically excludes "any failure which is only technical or unimportant to the franchise relationship," or "any failure for a cause beyond the reasonable control of the franchisee." These restrictions on what constitutes a "failure" within the context of the PMPA must necessarily inform a determination of whether a franchisee's "failure" to make timely payments or "failure" to operate the marketing premises for seven consecutive days constitutes a valid ground for termination. That a default in complying with a contractual obligation has been deemed a reasonable ground for termination under the Act does not mean that compliance is always within the reasonable control of the franchisee. We agree with the Seventh Circuit that "a provision may be intrinsically reasonable, but unforeseen circumstances may impede compliance.... The 'beyond the reasonable control' limitation is merely a legislated excuse for non-performance." *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1224 n. 16 (7th Cir.1982). Hence, a franchisee's failure to operate a service station for seven days because of a flood or some other cause beyond his or her reasonable control would appear not to constitute grounds for termination of the franchise under the PMPA because such failure would not fall within the definition of failure under the Act.

Our task in construing § 2802(c) "is to interpret the words ... in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *see Brach v. Amoco Oil Co.,* 677 F.2d at 1220. In enacting the PMPA, Congress recognized "the legitimate needs of a franchisor to be able to terminate a franchise ... based upon certain actions of the franchisee, including certain failures to comply with contractual obligations ...." S.Rep. No. 731, 95th Cong., 2d Sess. 19, U.S.Code Cong. & Admin.News 1978, p. 877. The major thrust of the PMPA, however, is to protect franchisees from arbitrary or unfair termination by limiting the franchisor's ability to resort to such an "extreme remedy." *Id.* at 17. Numerous commentators have noted that judicial interpretation of the PMPA must take into account the Act's primary goal of protecting franchisees.[5] Allowing a franchise agreement to be cancelled anytime the franchisee makes even one late payment or closes the service station for seven days, regardless of how compelling the reason or how minor the incident, would undermine the protective purpose of the PMPA and conceivably could facilitate the very type of unfair or arbitrary terminations sought to be prohibited by the Act. Although the legislative history is not unambiguous, in light of the Act's specific intent to benefit franchisees, we decline to construe § 2802(c) as a per se termination rule favoring franchisors.

**B.**

▮ Consequently, we cannot agree with the district court that no reason can justify a franchisee's failure to make timely payments or to keep open the marketing premises. Because the district court disposed of this matter on a motion for summary judgment, we must review the evidence in the light most favorable to the non-moving party. *Kaufman v. Solomon,* 524 F.2d 501, 502 (3d Cir.1975). Employing this stan-

---

**5.** *See e.g.,* Finch, Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation, 37 *Business Lawyer* 141 (1981); Comment, Retail Gasoline Terminations and Nonrenewals under Title I of the Petroleum Marketing Practices Act, 1980 *Duke L.J.* 522 (1980).

dard, we conclude that Rago has failed to put forth any reasons in either the pleadings or the deposition which would excuse the admitted closing of his service station for ten consecutive days in April, 1981.

In ¶ 77 of his Answer to the Complaint, Rago asserted that he closed the station "due to a theft by one of his employees and the other employee terminating his employment...." Although the record made it clear that Rago frequently ran the station by himself, and that his normal hours of business were 7:00 a.m. to 7:00 p.m. seven days a week, he offered no compelling reason for his own inability to open the station at all for ten days. In response to Sun's notice of termination, Rago wrote a letter detailing the "reasons probable" for his failure to keep the station open. During his deposition, Rago admitted that these reasons were merely hypothetical examples of why a franchisee might have to close a station; they were not advanced as the actual reasons for his own closing. Rago testified that a robbery, the need to conduct an inventory, and various personal problems made it impossible for him to run the station during the ten days at issue. However, the robbery occurred on April 7, four days before the station was closed, and the inventory was completed in less than four hours during the evening of April 10. Rago's various personal problems, including the need to locate a former employee and the aftereffects of a dental appointment on April 9, similarly do not account for any significant amount of his time during the period of April 11 to April 20. After reviewing the record, we conclude that under the circumstances Rago's failure to operate the station was a sufficient ground for terminating his franchise under § 2802(c)(9)(A) of the PMPA.

### III.

Section 2802(b)(2)(C) allows a franchisor to terminate a franchise upon the occurrence of a relevant event which makes termination reasonable if the "franchisor first acquired actual or constructive knowledge of such occurrence" not more than 60 or 120 days prior to notification of termination, depending upon which notification provision of the Act is applicable. Congress imposed these time limitations in order to "preclude the franchisor from basing termination ... upon old and long forgotten events," although "the time limitations are not intended to stop a franchisor from exercising termination ... rights based upon a future event ... if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or nonrenewal rights was waived." S.Rep. No. 731, 95th Cong., 2d Sess. 33, U.S.Code Cong. & Admin.News 1978, p. 892. Sun relies upon this legislative pronouncement in asserting that it could terminate Rago's franchise by treating each late payment as a separate event within the meaning of § 2802(b)(2)(C). Congress, however, specifically provided for utilization of a timely payment standard in the PMPA in order "to permit evaluation of nonpayment or late payments in view of prevailing commercial or industry trade practices." S.Rep. No. 731, 95th Cong., 2d Sess. 38, U.S.Code Cong. & Admin.News 1978, p. 896. Sun's repeated acceptance of late payments over a period of years would suggest that timely payment was not its prevailing trade practice. Although we do not decide this issue, there is a serious question under the PMPA whether Sun's past practices precluded it from basing termination on late payments absent any notice that timely payment would be required in the future.

### IV.

For the reasons set forth above, the judgment of the district court will be affirmed.