**Prakash H. PATEL, et al., Plaintiffs,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**Civil Action No. 94–4318.**

United States District Court,
E.D. Pennsylvania.

Nov. 15, 1996.

Lawrence R. Scheetz, Richboro, PA, for Plaintiffs.

John F. Fox, Jr., Philadelphia, PA, for Defendant Lancaster Associates.

James M. Brogan, Christopher W. Wasson of Piper & Marbury, L.L.P., Philadelphia, PA, for defendant Sun Company, Inc.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiffs Prakash H. Patel and Shobha P. Patel (the "Patels") brought this action against Defendants Sun Company, Inc. ("Sun") and Lancaster Associates ("Lancaster") under the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C.A. §§ 2801–2841 (West 1982 & Supp.1996). On April 8, 1996, Sun moved for summary judgment under Federal Rule of Civil Procedure 56 to dismiss with prejudice the complaint of the Patels. That same day, the Patels moved for partial summary judgment with respect to Sun's liability under the PMPA. Both motions are now under consideration, and for the reasons stated below, I will deny the Patels' motion for partial summary judgment and grant Sun's motion for summary judgment.

## I. SUMMARY OF FACTS

The parties do not dispute the material facts relevant to the disposition of this controversy. Sun and the Patels entered into a franchise relationship in 1978 for the operation of a Sunoco gas station located in Wayne, Pennsylvania. At that time, Sun was the owner of the real estate upon which the service station premises were located.

In 1985, Sun and the Patels entered into a franchise agreement renewing the franchise for a period of three years. In 1987, Sun entered into an agreement of sale with Lancaster for the sale of a parcel of land that included both an office building and the service station premises at issue here. In connection with the sale, Lancaster agreed to lease the service station premises back to Sun for a term beginning on December 23, 1987 and ending on September 30, 1994. Sun then subleased the service station premises to the Patels so that they could continue operating the service station under the terms of the franchise.

In 1988, the Patels and Sun renewed the franchise for a term of three years. Before the commencement of this renewal, Sun notified the Patels in writing that its right to grant possession of the service station premises to the Patels was subject to an underlying lease with an initial term of six years, nine months, and seven days. Sun informed the Patels that this underlying lease would expire on September 30, 1994 and that it might not be renewed upon expiration.

In 1991, the Patels and Sun renewed the franchise for another three years. Before the commencement of this latest renewal, Sun again notified the Patels in writing that its right to grant possession of the service station premises was subject to an underlying lease that would expire on September 30, 1994 and that the lease might not be renewed.

In 1994, Sun sent the Patels a letter by certified mail dated April 28, 1994 notifying the Patels that the franchise would not be renewed and that the nonrenewal would be effective August 20, 1994. Sun explained in the notification letter that the franchise would not be renewed because the underly-

ing lease would expire on September 30, 1994.

The Patels then filed this lawsuit, seeking preliminary injunctive relief and declaratory judgment on grounds that the impending nonrenewal of the franchise relationship would violate the PMPA.

## II. PRIOR PROCEEDINGS

This litigation follows an earlier lawsuit filed in 1988 in the Eastern District of Pennsylvania by the Patels against Sun and Lancaster. The earlier lawsuit and the instant action both revolve around the same alleged wrongdoing. The Patels allege that Sun did not offer to sell the service station premises to them in 1987 and that Sun did not offer them a right of first refusal of Lancaster's offer to purchase the service station premises. The Patels contend that Sun's alleged failure to make an offer or to grant a right of first refusal violated the PMPA.

Chief Judge (now Senior Judge) Fullam dismissed the earlier lawsuit because at the time it was pending, Sun had not terminated the franchise or failed to renew the franchise relationship. *See Patel v. Sun Ref. & Mktg. Co.*, No. CIV. A. 88–3958, 1992 WL 25737, at *2 (E.D.Pa. Feb. 7, 1992). He ruled that in the absence of a termination or nonrenewal, he did not have jurisdiction under 15 U.S.C.A. § 2805(a) of the PMPA to hear the case. *See id.* Earlier in the proceedings, he had rejected the Patels' claim that Sun's alleged failure to offer the premises violated the PMPA, explaining that "the franchisor is at liberty to sell the premises at any time, to anyone; all the statute says is that such a sale cannot justify non-renewal of the franchise unless the franchisor did allow the franchisee to purchase." *Patel v. Sun Ref. & Mktg. Co.*, 710 F.Supp. 1023, 1024 (E.D.Pa. 1989). The Patels did not appeal either of these rulings.

The Patels filed the instant action on July 15, 1994, following notification that the franchise would not be renewed. Now that non-

renewal was clearly about to occur, they again sought relief based on the argument that Sun's alleged failure to offer the premises was wrongful. The complaint requested a preliminary injunction barring Sun from failing to renew the franchise relationship on August 20, 1994. The complaint also requested declaratory judgment that the relationship between the parties was governed by the PMPA, that Sun and Lancaster were both subject to the obligations of the PMPA, and that Sun was liable for actual and exemplary damages and reasonable attorney fees.

On November 1, 1994, I denied the Patels' motion for a preliminary injunction. *See Patel v. Sun Co.*, 866 F.Supp. 871, 874 (E.D.Pa. 1994). I determined that no fair grounds for litigation existed because the 1987 sale to Lancaster did not trigger the right to an offer of sale under 15 U.S.C.A. § 2802(b)(3)(D)(iii) and the 1994 nonrenewal was justified by the expiration of Sun's underlying lease with Lancaster under 15 U.S.C.A. § 2802(b)(2)(C) and 2802(c)(4). *See id.* at 873.

On August 21, 1995, the United States Court of Appeals for the Third Circuit affirmed my decision. *See Patel v. Sun Co.*, 63 F.3d 248, 253 (3d Cir.1995). The Third Circuit did not address the merits of the lawsuit, however, to reach its decision. *See id.* at 252. Rather, the Third Circuit determined that 15 U.S.C.A. § 2805(e) barred injunctive relief in this case. *See id.* at 252–53. Thus, the Third Circuit had no reason to address the substantive issue whether fair grounds for litigation existed because even if it had found that such grounds did exist and that a preliminary injunction were otherwise warranted, it would have still had to rule against the preliminary injunction, based on its determination that § 2805(e) applied in this case. Having determined that injunctive relief was unavailable in this case, the Third Circuit remanded for a determination of Sun's liability for damages under the PMPA. *See id.* at 253.[1]

---

1. Although the Patels never asked for damages in the complaint nor sought at any time to amend the complaint to request damages, the Third Circuit stressed in its opinion the fact that the Patels still had an "opportunity to seek damages under

the PMPA" on remand, *Patel*, 63 F.3d at 253, and accordingly I will address the issue of Sun's liability for damages, as I believe is consistent with the Third Circuit's mandate.

The Patels argue that the Third Circuit implicitly addressed the merits of the case by determining that § 2805(e) applies to this case. They argue that the application of § 2805(e) reflects a decision by the Third Circuit that Sun's nonrenewal was, under the PMPA, triggered by the 1987 sale of the service station premises to Lancaster. *See* Mem.Supp.Pls.' Mot. Partial Summ.J. at 2–3, 13. Because the Patels' claim, if true, would significantly narrow the proper scope of inquiry on remand, I will address their contention now before proceeding any further in consideration of the parties' respective motions for summary judgment.[2]

■ I am of course bound to implement the Third Circuit's mandate, whether its decisions were made explicitly or implicitly. *See Casey v. Planned Parenthood,* 14 F.3d 848, 856–57 (3d Cir.), *stay denied,* 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994). Although the language of the statute gives me pause, I conclude for the following reasons that the Third Circuit did not implicitly decide that Sun's nonrenewal was based on the 1987 sale rather than the 1994 lease-expiration.

First, the Third Circuit assured the Patels that they still had "the opportunity to present to the district court their contention that the nonrenewal of their franchise violates § 2802 because the reason given for nonrenewal, the expiration of the underlying lease, was a condition created by the franchisor when it sold the property without offering the franchisee an opportunity to purchase it." *See Patel,* 63 F.3d at 253. It is hard to understand why the Third Circuit would expect further proceedings in this litigation to center around the lease-expiration defense if it had decided that Sun's nonrenewal was based on the 1987 sale rather than the 1994 lease-expiration. As the Patels assert, if the Third Circuit had made such a determination, the only question left for decision on remand would be whether Sun had made a bona fide offer to the Patels.

Second, I am hesitant to conclude that the Third Circuit decided the crucial question of how to characterize Sun's nonrenewal under the PMPA without any discussion of the issue. Deciding that nonrenewal was based on the sale rather than the lease-expiration would essentially hold that the franchisor may not rely on the lease-expiration defense unless it offered to sell the premises to the franchisee at the time of sale. This is the central issue in the case and a novel question under the PMPA. The complete absence of analysis on such an important issue, in contrast to the detailed analysis set forth in support of its rulings concerning the availability of injunctive relief, suggests that the Third Circuit may not have intended to make any decision about the merits of the case when it determined that § 2805(e) applied.

Finally, I note that resting in the background throughout the proceedings in this case is the practical impossibility posed by granting the requested injunctive relief. The Third Circuit determined that Lancaster could not be enjoined under the PMPA because it was not a franchisor within the meaning of §§ 2801(3) and 2805(a). *See Patel,* 63 F.3d at 251–52. Yet Lancaster was the only party who had the right to grant possession of the premises to the Patels at the time this suit was brought. Therefore, injunctive relief would be unavailable as a

---

**2.** The Patels seem to contend that, by deciding that § 2805(e) applied to this case, the Third Circuit implicitly determined that Sun's nonrenewal of the franchise in 1994 was based on the sale of the service station premises to Lancaster in 1987. They cite to § 2805(e)(1), which bars injunctive relief only if nonrenewal is based on one of five enumerated reasons. From this they argue that expiration of an underlying lease is not among the five reasons listed in § 2805(e)(1), but that sale of the premises is, and thus that the Third Circuit must have decided that the basis of Sun's nonrenewal was the sale of the premises to Lancaster in 1987, rather than the expiration of the underlying lease with Lancaster in 1994. They continue by arguing that if the nonrenewal was based on a sale, then the legality of the nonrenewal must be assessed under § 2802(b)(3)(D), which allows a franchisor to fail to renew a franchise relationship if the franchisor decides to sell the premises. One of the conditions of § 2802(b)(3)(D), however, is that the franchisor must have previously offered the premises to the franchisee or granted the franchisee a right of first refusal. § 2802(b)(3)(D)(iii). It follows, they argue, that the only question remaining on remand is whether Sun made a bona fide offer to the Patels or granted them a right of first refusal before it sold the premises to Lancaster in 1987. *See* Mem. Supp.Pls.' Mot.Partial Summ.J. at 2–3, 13.

remedy against Sun if the court had decided that the PMPA's nonrenewal section had been violated. *Cf. Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195, 1205 (3d Cir.1992) ("[W]e ... do not perceive at this time how a court could order injunctive relief with respect to the South parcel if GPI no longer owns it."). With this in mind, it is likely that the Third Circuit viewed § 2805(e) as precluding an injunction against a franchisor who "simply for business reasons wants to close down its retail operations in a certain location," *Patel,* 63 F.3d at 252, as opposed to a franchisor who was continuing operations with another franchisee. Under this rationale, the expiration of a lease is simply a business decision to shut down franchise operations. Thus, when Sun entered into a sale-leaseback arrangement back in 1987 with Lancaster and renewed the franchise relationship with the Patels under these terms, it was simply a determination by Sun for business reasons to close down its retail operations at this site at a future time, namely, at the expiration of the underlying lease. Therefore, because there had already been a sale of land, rather than merely an intention to do so, injunctive relief was no longer available as a remedy for noncompliance with the statutory provisions relating to nonrenewal.

Taken together, the reasons just stated persuade me that the Third Circuit did not determine that the 1994 nonrenewal was based on the 1987 sale of the premises to Lancaster and that the scope of its mandate embraced no more than that which was claimed, namely, "whether injunctive relief is still an available remedy." *Id.* at 249.

On remand following the Third Circuit's decision, all of the parties submitted motions for summary judgment. On September 30, 1996, I granted Lancaster's motion for summary judgment to dismiss with prejudice the complaint of the Patels against Lancaster. Now before me for decision are the remaining cross-motions of the Patels and Sun, which squarely present the issue of Sun's liability for damages under the PMPA.

## III. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and any accompanying affidavits demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. Liability Under the PMPA

The Patels have never, up to this time, asked for damages, nor at any time sought to amend the complaint to request damages. The primary relief they have pursued in this litigation is an injunction, which has clearly been foreclosed by the Third Circuit's opinion in this case. In denying injunctive relief, however, the Third Circuit stressed the fact that the Patels still had an "opportunity to seek damages under the PMPA" and remanded for further proceedings consistent with its opinion. *See Patel,* 63 F.3d at 253. Accordingly, in light of the Third Circuit's mandate, I will address the merits of the claim that Sun is liable for damages under the PMPA.

The PMPA prohibits a franchisor from failing to renew a franchise relationship unless the franchisor complies with the requirements of § 2802(b). 15 U.S.C.A. § 2802(a)(2). Section 2802(b) sets forth two requirements for nonrenewal: (1) the franchisor must notify the franchisee of the nonrenewal in accordance with § 2804, and (2) the franchisor's decision not to renew must be based upon one of the grounds described in § 2802(b)(2)–(3). § 2802(b)(1).

Section 2804, in relevant part, requires the franchisor to notify the franchisee of its decision not to renew at least 90 days before the nonrenewal will take effect. 15 U.S.C.A. § 2804(a)(2). Such notice must be in writing, and it must notify the franchisee of the reasons for nonrenewal and the date nonrenewal will take effect. § 2804(a)(1), (c).

One of the grounds upon which nonrenewal may be based is "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which ... nonrenewal of the franchise relationship is reasonable." § 2802(b)(2)(C). This ground is defined to include "loss of the franchisor's right to grant

possession of the leased marketing premises through expiration of an underlying lease." § 2802(c)(4). A condition of this ground is that the franchisor must have notified the franchisee, "prior to the commencement of the term of the then existing franchise of the duration of the underlying lease, and of the fact that such underlying lease might expire and not be renewed ... at the end of such term." *Id.*

■ Sun complied with all of the requirements set forth in § 2802(b) when it declined to renew the franchise relationship with the Patels in 1994. As for the first requirement of § 2802(b)(1), proper notification, Sun notified the Patels by letter dated April 28, 1994 that it would not renew the franchise. This notification was given more than 90 days prior to August 20, 1994, the date nonrenewal took effect. Thus, Sun complied with § 2804(a)(2). Furthermore, the notification

letter informed the Patels that nonrenewal would take effect on August 20, 1994, and that the reason for nonrenewal was that the underlying lease with Lancaster would expire on September 30, 1994. Thus, Sun complied with the requirements of § 2804(a)(1) and 2804(c). Accordingly, Sun satisfied the first requirement of § 2802(b)(1) because it notified the Patels of the nonrenewal in accordance with § 2804.

■ As for the second requirement of § 2802(b)(1), proper basis for nonrenewal, Sun declined to renew the franchise relationship because the underlying lease with Lancaster expired in 1994 and Sun therefore no longer had the right to grant possession of the leased marketing premises to the Patels. Loss of the right to grant possession through expiration of an underlying lease is a permissible ground for nonrenewal under § 2802(b)(2)(C) and 2802(c)(4).[3] Further-

3. The Patels contend that even if the expiration of an underlying lease is enumerated in § 2802(c)(4), courts are still bound by § 2802(b)(2)(C) to evaluate the entire transaction leading up to the lease's expiration to determine whether the lease expiration is a "reasonable" event justifying nonrenewal. *See* Reply Mem. Opp'n Def.'s Mot.Summ.J. at 10–11, 13–19. They cite *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670 (3d Cir.1984) and *Slatky v. Amoco Oil Co.*, 830 F.2d 476 (3d Cir.1987) (in banc) in support of their position. Sun responds that under *Lugar v. Texaco, Inc.*, 755 F.2d 53 (3d Cir.1985), courts may not evaluate the reasonableness of events that fall under one of the enumerated categories in § 2802(c). *See* Mem.Supp.Mot.Summ.J. of Def. Sun Co., Inc. at 5–8. The Patels respond by arguing that Congress overruled *Lugar* when it amended the PMPA in 1994. *See* Reply Mem. Opp'n Def.'s Mot.Summ.J. at 11, 18–19.

In *Rago*, the franchisor terminated the franchise under § 2802(b)(2)(C) because the franchisee had closed the station for a period of ten consecutive days and had failed to pay rent on time. *See Rago*, 741 F.2d at 671. Section 2802(b)(2)(C) is defined to include a "failure by the franchisee to operate the marketing premises for 7 consecutive days," § 2802(c)(9)(A), and a "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," § 2802(c)(8). Because these events are enumerated in § 2802(c) as statutorily defined events making termination reasonable under § 2802(b)(2)(C), the district court ruled that it had no authority to evaluate the reasonableness of the termination and that any untimely payment or lengthy closing of the station was a per se ground for termination. *See Rago*, 741 F.2d at 672–73. In reject-

ing a per se approach, the Third Circuit cited the "Act's specific intent to benefit franchisees" and stressed that "failure" is defined by the PMPA to exclude technical or unimportant failures or those failures caused by factors beyond the reasonable control of the franchisee and therefore that any interpretation of a failure to make timely payments or to keep the station open must take into account the reasons for the failure. *See id.* at 673.

Whatever avenue *Rago* might have opened up for arguing that enumerated events in § 2802(c) should still be subject to a general reasonableness inquiry, the Third Circuit closed the next year in *Lugar*. In *Lugar*, the Third Circuit addressed the question whether the expiration of an underlying lease, despite its enumeration in § 2802(c), could nonetheless fail to be an event making termination reasonable under § 2802(b)(2)(C) if the franchisor did not assign to the franchisee an option to purchase the service station premises. *See Lugar*, 755 F.2d at 54. The Third Circuit began by observing that based on simply the language of the statute, "it is plausible to argue that the franchisor's voluntary relinquishment of a lease does not constitute a permissible 'event'." *Id.* at 56. Turning to the legislative history, however, the Third Circuit noted that Congress specifically contemplated that an underlying lease might expire as a result of the franchisor's own failure to exercise an option to renew the lease. *See id.* Analogizing the franchisor's failure to exercise an option to purchase the premises to a failure to exercise an option to renew the lease, the Third Circuit determined that the lease expiration at issue was the kind of event contemplated in § 2802(c)(4). *See id.* The Third Circuit concluded by stating that "because we have found that Texaco's non-

more, Sun notified the Patels in writing, before the franchise commenced in 1991, that the underlying lease with Lancaster would expire in 1994 and that it might not be

renewal fit within 15 U.S.C. § 2802(c)(4), the court could not evaluate the reasonableness of Texaco's action under 15 U.S.C. § 2802(b)(2)(C)." *Id.* at 58. The Third Circuit distinguished *Rago* on grounds that "[b]ecause the statute excuses a franchisee's failures when they are due to 'a cause beyond the reasonable control of the franchisee,' 15 U.S.C. § 2801(13)(B), we were obliged to analyze whether the franchisee's failure to open the station for ten days was unwarranted before we could find that the termination was justified under 15 U.S.C. § 2802(c)(9)." *Id.* n. 3.

Thus, under *Lugar,* a court must initially determine whether a particular ground for nonrenewal falls under one of the categories enumerated in § 2802(c), but once it has determined that the ground does fall under one of the enumerated categories in § 2802(c), a court may not then independently assess whether that ground is reasonable. Here, Sun's ground for nonrenewal fits into the lease-expiration category under § 2802(c)(4). Sun's underlying lease with Lancaster expired on September 30, 1994, and the question of unexercised options to renew the lease or purchase the premises is not at issue. Moreover, nothing in the legislative history suggests that Sun's nonrenewal is not the kind of event described in § 2802(c)(4). The Senate Report contemplates that "[e]xpiration of the underlying lease could occur under a variety of circumstances," one example being a franchisor's decision not to exercise an option to renew the lease. S.Rep. No. 731, 95th Cong., 2d Sess. 38 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 896. The Senate Report also explains what the lease-expiration category does not include: "[I]t is not intended that termination or non-renewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of the expiration of which no substantive change in control of the premises results." *Id.* Thus, Congress did not mean to sanction nonrenewals based on purely nominal transactions when it enacted § 2802(c)(4). No evidence has been shown here, however, that Sun dealt with Lancaster in any other fashion than at arms length or that it has retained any degree of control over the premises after the underlying lease expired. Sun's nonrenewal is properly predicated on § 2802(c)(4), and thus *Lugar* instructs me that I may not entertain arguments based on general notions of reasonableness. Additionally, I note that what the Patels ask me to address under the label of "reasonableness" in the context of § 2802(b)(2)(C) is more appropriately addressed directly in accordance with their primary argument that the sale-leaseback transaction constitutes an improper end run around the bona fide offer requirement of

renewed at the end of the franchise term. Thus, Sun properly notified the Patels of the underlying lease, as required by § 2802(c)(4).[4] Accordingly, Sun satisfied the

the sale provisions set forth in § 2802(c)(4), an argument that I address at length below.

As for the Patels' contention that Congress overruled *Lugar* when it amended the PMPA in 1994, I note that although Congress did amend § 2802(c)(4) to require a franchisor to offer to assign to the franchisee any option to extend the lease or option to purchase the premises, *see* Petroleum Marketing Practices Act Amendments of 1994, Pub.L. No. 103–371, sec. 3, § 102(c)(4), 108 Stat. 3484, 3484 (codified at 15 U.S.C.A. § 2802(c)(4)(B) (West Supp.1996)), it did not alter *Lugar*'s underlying rationale, namely that courts should not evaluate the reasonableness of an event that properly falls under one of the enumerated grounds set forth in § 2802(c). Thus, when Congress wished to deal with nonrenewal of an option, the exact facts in *Lugar,* it only dealt with this specific concern. It did not take the route available to it of amending the statutory language to add a general requirement of reasonableness. Nothing in the text of the amendments or in the accompanying legislative history, *see* H.R.Rep. No. 737, 103d Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 2779; S.Rep. No. 387, 103d Cong., 2d Sess. (1994), *available at* 1994 WL 534750; 140 Cong. Rec. H10,575–76 (daily ed. Oct. 3, 1994); 140 Cong.Rec. H10,735 (daily ed. Oct. 4, 1994); 140 Cong.Rec. S14,236–37 (daily ed. Oct. 5, 1994), demonstrates an intent to change the scope of the reasonableness inquiry under § 2802(b)(2)(C). Therefore, even though the result reached in *Lugar* is no longer the law under the PMPA, I find no reason to doubt that *Lugar* remains the governing standard in this Circuit with respect to its interpretation of the scope of the reasonableness inquiry under § 2802(b)(2)(C).

Finally, I note that the Patels' reliance on *Slatky* is misplaced. *Slatky* addressed the question of what constitutes a "bona fide offer" within the meaning of § 2802(b)(3)(D)(iii)(I). *See Slatky,* 830 F.2d at 478. The Third Circuit determined that a franchisor's subjective belief in the fairness of its offer price is not sufficient under the statute, but that a "bona fide offer" must also be objectively reasonable, that is, it must approach fair market value. *See id.* at 480–85. The question of whether a "bona fide offer" should be evaluated under a subjective or objective reasonableness standard is a different issue than whether the events enumerated in § 2802(c), which statutorily define the meaning of reasonable termination events in § 2802(b)(2)(C), are nonetheless subject to judicial evaluation of reasonableness.

**4.** The Patels contend that the notice was insufficient because Sun knew in 1987 that the underly-

second requirement of § 2802(b)(1) because nonrenewal was based on a ground described in § 2802(b)(2).

Because Sun gave the Patels proper notification of the nonrenewal and because Sun's nonrenewal was based on a permissible ground described in § 2802(b), the PMPA permitted Sun to decline to renew the franchise relationship with the Patels in 1994.

■ The Patels contend, however, that Sun cannot rely on the lease-expiration defense set forth in § 2802(b)(2)(C) and 2802(c)(4), even though it complied with all of the statutory requirements, because Sun sold the service station premises to Lancaster in 1987 allegedly without first offering to sell the premises to the Patels or giving them a right of first refusal. Although the statute imposes no such condition on the lease-expiration defense, the Patels insist that one must be read into the statute to prevent what they contend is an "end run around the mandatory offer provisions" of § 2802(b)(3)(D). Mem.Supp.Pls.' Mot.Partial Summ.J. at 4.

The Patels argue that if Sun had not renewed the franchise relationship back in 1987 when it sold the service station premises to Lancaster, Sun would have been obligated to offer to sell the premises to them. They rely on § 2802(b)(3)(D), which permits a franchisor to fail to renew a franchise relationship if it sells the service station premises, but only on the condition that it has "made a bona fide offer to sell ... to the franchisee such franchisor's interests in such premises" or "offered the franchisee a right of first refusal ... of an offer, made by another, to purchase such franchisor's interest in such premises." § 2802(b)(3)(D)(iii).

The Patels argue that Sun sought to evade this bona fide offer requirement by obtaining a leaseback and renewing the franchise relationship for seven more years. In their view, the bona fide offer requirement reflects a congressional desire to guarantee franchisees a "tenancy for life" in the service station premises. See Mem.Supp.Pls.' Mot.Partial Summ.J. at 14. They contend that a sale-leaseback arrangement undermines this intent and operates as an end run around the offer requirement because the statute permits a franchisor to end the franchise relationship if the underlying lease expires, regardless of whether the franchisor has made an offer to the franchisee. The Patels ask me to close up what they characterize as an unintended "loophole" in the PMPA by writing into the statute an additional condition to the lease-expiration defense set forth in § 2802(b)(2)(C) and 2802(c)(4): that if at any time during the course of the franchise relationship the franchisor sold the premises, the franchisor must have offered to sell the premises to the franchisee or granted the franchisee a right of first refusal (a condition I will refer to as a "sale-leaseback offer requirement" or an "SLO requirement").

■ Sun argues that imposing an SLO requirement would simply be a brazen act of legislation by the court. On the other hand, the Patels take the position that it would be an appropriate imposition of an additional requirement to further the PMPA's underlying purposes. Obviously, it is not my role to judge whether such a requirement would make good policy, for that is the role of Congress. As the Third Circuit has reminded me in this very case, "[i]f there is a gap in the provisions of the PMPA, it should be

---

ing lease would expire in 1994 but did not notify the Patels of nonrenewal until April 28, 1994. See Reply Mem.Opp'n Def.'s Mot.Summ.J. at 7–8. They rely on § 2802(b)(2)(C)(i), which requires a franchisor to notify a franchisee of nonrenewal not more than 120 days after it first acquired actual or constructive knowledge of the occurrence of an event making nonrenewal reasonable, which in this case was the expiration of the underlying lease.

I agree with the First Circuit for the reasons stated in *Veracka v. Shell Oil Co.*, 655 F.2d 445 (1st Cir.1981) (Breyer, J.) that the more specific

notice requirements set forth in § 2802(c)(4), rather than the general notice requirement set forth in § 2802(b)(2)(C)(i), establish the governing standards for notification when nonrenewal is based on an expiration of the underlying lease. See id. at 449–50; see also *Graeber v. Mobil Oil Co.*, 614 F.Supp. 268, 272–74 (D.N.J.1985); *Gaspar v. Chevron Oil Co.*, 490 F.Supp. 971, 975 (D.N.J.1980); *Atkins v. Chevron USA Inc.*, 672 F.Supp. 1373, 1376 (W.D.Wash.1987); *Marks v. Shell Oil Co.*, 643 F.Supp. 1050, 1054 (E.D.Mich. 1986), *vacated on other grounds*, 830 F.2d 68 (6th Cir.1987).

corrected by Congress," not the courts.[5] *See Patel,* 63 F.3d at 253. It is only if Congress has clearly demonstrated a contrary intent that I may disregard the plain language of the statute. *See United States v. Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (alteration in original)); *Charles v. Charles,* 788 F.2d 960, 966 (3d Cir.1986) (stating that in the absence of a "clear, contrary legislative intent," the plain meaning of a statute must prevail); *Schramm v. Department of Health & Human Servs.,* 682 F.2d 85, 91 (3d Cir. 1982) (stating that courts are bound to follow the provisions of a statute as written if "Congress in plain language has expressed its intention, and the legislative history does not demonstrate a contrary purpose"). Thus, before I read such an additional unwritten requirement into the statute, I would have to be certain that it was Congress's intention that I do so. I am unable to draw this conclusion.

The PMPA was enacted in response to the problem of arbitrary or discriminatory franchise terminations or nonrenewals. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 17–19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 875–77. Congress was concerned that the inequality of bargaining power that often existed between franchisor and franchisee could result in franchise contracts weighted heavily in favor of the franchisor's interests at the expense of the franchisee's interests. *See id.* at 17, *reprinted in* 1978 U.S.C.C.A.N. at 876. Specifically, Congress was concerned that franchisors could use their superior bargaining power to obtain contractual provisions permitting termination of the franchise for even the most "technical or minor viola-

tions of the contract." *See id.* at 17–18, *reprinted in* 1978 U.S.C.C.A.N. at 876. Congress was also concerned about nonrenewal of the franchise upon its expiration, even though nonrenewal did not affect any definite contractual rights as termination did, because through their statements and actions franchisors often fostered expectations among their franchisees that the franchise relationship would be a continuing one. *See id.* at 18, *reprinted in* 1978 U.S.C.C.A.N. at 876.

The problem posed by a franchisor's virtually unlimited ability to terminate the franchise or not renew the franchise relationship was that it allowed the franchisor to exercise a coercive influence over the franchisee's marketing policies. Through the constant threat of termination or nonrenewal, a franchisor could compel a franchisee to comply with the franchisor's preferred marketing policies, even if those policies worked against the franchisee's own economic interests. This influence was magnified as the franchise periods became shorter and the renewal intervals more frequent. Thus, Congress perceived the prospect of arbitrary or discriminatory termination or nonrenewal as a problem requiring legislation because it threatened "the independence of the franchisee as a competitive influence in the marketplace." *See id.* at 17–18, *reprinted in* 1978 U.S.C.C.A.N. at 876–77.

Although Congress was concerned about the potential for abuse in the franchise relationship, it did not want the resulting legislation to interfere with the franchisor's ability to respond to legitimate business concerns. Congress recognized that although the use of termination to compel compliance with the franchisor's marketing policies would be improper, the franchisor had "legitimate needs ... to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain

---

**5.** Congress has demonstrated a willingness to revisit the PMPA to address new developments. In 1994, Congress amended the lease-expiration defense set forth in § 2802(b)(2)(C) and 2802(c)(4) to require a franchisor to offer to assign to the franchisee any option to extend the

lease or option to purchase the premises. *See* Petroleum Marketing Practices Act Amendments of 1994, Pub.L. No. 103–371, sec. 3, § 102(c)(4), 108 Stat. 3484, 3484 (codified at 15 U.S.C.A. § 2802(c)(4)(B) (West Supp.1996)).

changes in circumstances." *See id.* at 19, *reprinted in* 1978 U.S.C.C.A.N. at 877. Furthermore, Congress wanted to assure the franchisor that it would retain its freedom to end the franchise relationship for legitimate business reasons. Congress found it "[p]articularly important ... that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Id.* Thus, whereas Congress intended to remedy the abusive aspects of the franchise relationship by curbing a franchisor's ability to terminate the franchise or not renew the franchise relationship for arbitrary or discriminatory reasons, Congress also emphasized the importance of preserving the franchisor's freedom to operate its franchising activities in accordance with its proper business needs.

Congress's intent is reflected in the general scheme of the statute. Section 2802(b) sets forth an exhaustive list of reasons for which a franchisor may terminate the franchise or not renew the franchise relationship, and § 2802(a) then prohibits termination or nonrenewal based on any other reason. Thus, under the PMPA, a franchisor no longer has the power to terminate the franchise for the slightest infraction of the franchise contract, even if it could bargain for the contractual right to do so, because § 2802(b)(2)(A) does not permit a franchisor to terminate the franchise for contract violations unless the provisions of the contract that were violated are "both reasonable and of material significance to the franchise relationship."

At the same time, § 2802(b) permits the franchisor to respond to genuine cases of franchisee misconduct, and it preserves the franchisor's flexibility to end the franchise relationship for a number of business reasons, as well as a limited set of other reasonable circumstances. Thus, for example, the franchisor may terminate the franchise if the franchisee fails to make good faith efforts to comply with the franchise contract, § 2802(b)(2)(B), or engages in fraud or criminal misconduct in connection with the opera-

tion of the marketing premises, § 2802(b)(2)(C), (c)(1). Also, the franchisor may terminate or not renew the franchise for legitimate business reasons such as a determination to cease operating retail outlets in the relevant geographic market area, § 2802(b)(2)(E), or to sell the marketing premises, § 2802(b)(3)(D)(i)(III). The franchisor may also terminate the franchise for other reasonable circumstances, including a governmental taking of the marketing premises through the exercise of eminent domain, § 2802(b)(2)(C), (c)(5), the declaration of bankruptcy by the franchisee, § 2802(b)(2)(C), (c)(2), or as in the case before me, the expiration of an underlying lease with a third party lessor, § 2802(b)(2)(C), (c)(4). As a survey of these provisions shows, § 2802 corrects the imbalance in the franchise relationship that concerned Congress by removing the threat of arbitrary or discriminatory termination or nonrenewal and yet preserves the franchisor's ability to respond to legitimate concerns, whether those concerns involve franchisee misconduct or the franchisor's own need to conduct its business appropriately in the face of changing market conditions and consumer preferences.

To take the Patels' position, I would have to conclude that the sale-leaseback arrangement between Sun and Lancaster does not come within this rubric, although it clearly does. Sun did not gain an ability, by virtue of the sale-leaseback arrangement, to arbitrarily terminate the franchise relationship or to threaten the Patels with termination as a penalty for noncompliance with Sun's preferred marketing policies. Sun was still constrained by the PMPA to renew the franchise relationship in all but the limited number of situations set forth in § 2802(b).

Furthermore, I have no reason to believe that the sale-leaseback arrangement is not the kind of business decision that Congress intended to respect when it enacted the PMPA. No evidence has been shown that Sun acted out of any bad faith desire to defeat the Patels' rights under the PMPA. The Patels ask me to imply bad faith based on the very fact that Sun obtained a leaseback, but this I cannot do. Plenty of legiti-

mate business reasons exist for entering into a sale-leaseback arrangement that are wholly independent of any secondary effect the transaction might have on the respective rights and obligations of franchisor and franchisee under the PMPA upon termination or nonrenewal. To speculate, a franchisor may, for example, determine that ownership of the real estate upon which the service station premises are located has become undesirable from a business standpoint, perhaps because of the risk of liability under environmental regulations or as a result of tax considerations, and yet wish to defer until a later date the economic change associated with a sale of the property. The Patels have failed to provide me with any indication, either in the provisions of the statute or in the legislative history, that Congress opposed the kind of sale-leaseback arrangement entered into by Sun, and insofar as Congress emphasized the importance of preserving the franchisor's freedom to make legitimate business decisions, I must conclude that Congress would have endorsed both the franchisor's decision to enter into a sale-leaseback transaction and its subsequent reliance on the lease-expiration defense when and if the underlying lease expires without a renewal.

Moreover, it is not clear to me, as it would have to be if I am to write an additional, unwritten condition into the statute, that Congress intended to impose an SLO requirement as a condition of the lease-expiration defense. I find no indication in the legislative history that Congress intended to impose such a condition, nor have the Patels pointed me to any such indication. The Patels apparently want me to conclude from the statutory language itself that the bona fide offer requirement guarantees a "tenancy of life" for franchisees leasing from franchisors who own the service station premises and that an application of the statute that results in something less must somehow violate congressional intent.

■ The reality is that the PMPA does not guarantee franchisees life tenancy in the service station premises. At most, a franchisee has an opportunity to buy the service station premises. There is no guarantee that the franchisee will be able to afford the purchase price or to secure the necessary financing. Nor is there a guarantee that the franchisee will be able to obtain another franchisor willing to deal with the franchisee on terms that the franchisee can accept. Nor is there a guarantee that the franchisee will be able to maintain franchise operations with any such franchisor for an extended period of time.

■ Moreover, aside from simple economic risk, the statute itself guarantees something less than the Patels would have me believe. If I am to infer from the language of the statute what Congress intended to accomplish with the offer requirement, I must consider what that requirement actually guarantees a franchisee when all of the other provisions of the statute are taken into account. Although the sale provision in § 2802(b)(3)(D) does require a franchisor to offer the premises to the franchisee, it does so only as a condition of an affirmative defense to nonrenewal. § 2802(b)(1)(B). By complying with the offer requirement, the franchisor can establish a defense to liability for nonrenewal, but the offer requirement itself is not a right a franchisee can enforce. The only right the franchisee can enforce is the right not to be terminated or not renewed. § 2802(a). Furthermore, § 2805(e)(1) precludes injunctive relief when nonrenewal is based on a sale of the service station premises. Unlike most of the other grounds for nonrenewal, in which a franchisee can obtain injunctive relief for noncompliance with the requirements of § 2802, when a sale of the premises is involved, Congress was content to leave the franchisee with an action for damages if the franchisor failed to comply with the requirements of § 2802, which would include a failure to make an offer. § 2805(e)(2). Thus, the bona fide offer requirement of § 2802(b)(3)(D) is not nearly so strong a right as it would appear to be when viewed in isolation from §§ 2802(b)(1)(B) and 2805(e)(1); when the operation of these other provisions are taken into account, it can be seen that the franchisee has no means under the statute to force the franchisor to make an offer. Far from guaranteeing a "tenancy of life," the statute in actuality guarantees only a right to seek

damages if the franchisor fails to make an offer before declining to renew the franchise on account of a sale of the premises.

Thus, whereas the statute offered the Patels no means of obtaining the marketing premises from Sun had Sun simply sold the premises in 1987, and whereas the Patels had no guarantee that they could have secured another franchisor had Sun offered the premises to them in 1987 or, even further, that they could have remained in business with such a franchisor until today, Sun assured the Patels that their franchise relationship would be renewed after the sale and Sun in fact extended the franchise for a total of seven more years after the sale. Seven years is a significant amount of time to remain in business. The Patels want me to believe that they did not get a fair shake, but they got seven more years in the franchise than they might have, had Sun simply terminated the franchise following the sale. It is not clear to me that Congress would find a sale followed by a renewal of the franchise relationship for a duration of this length to undermine the purposes it sought to accom- plish by enacting the PMPA.[6] Therefore, in the absence of clear congressional intent otherwise, I am unable to impose the SLO requirement as an additional condition of the lease-expiration defense set forth in § 2802(b)(2)(C) and 2802(c)(4) but must instead apply the statute as written.[7]

Accordingly, because Sun has satisfied all of the conditions of the affirmative defense set forth in § 2802(b)(2)(C) and 2802(c)(4), its nonrenewal of the franchise relationship with the Patels in 1994 did not violate § 2802(a)(2) of the PMPA, and I will therefore deny the Patels' Motion for Partial Summary Judgment and grant Sun's Motion for Summary Judgment.

### ORDER

AND NOW, this 15th day of November, 1996, IT IS ORDERED that:

1. Plaintiffs' Motion for Partial Summary Judgment is DENIED;

2. Defendant's Motion for Summary Judgment is GRANTED; and

---

**6.** I note, without deciding, that if I were willing to read a new provision into the PMPA, it might be a "bad faith" exception to the lease-expiration defense for franchisors who arranged a sale-leaseback transaction during the course of the franchise relationship with the purpose of evading the bona fide offer requirement (as for example, a one-month leaseback and franchise renewal period would tend to demonstrate). Of course, no such facts have been demonstrated here.

**7.** I also note one possible scenario that illustrates the complications an SLO requirement could create under the PMPA when nonrenewal or termination is not based on the lease-expiration defense set forth in § 2802(b)(2)(C) and 2802(c)(4). A franchisor could determine that it wants to maintain franchise operations at a particular location for at least the next ten years, but decide for legitimate business reasons that it wishes to divest itself of ownership of the marketing premises. To do so, of course, it could negotiate a leaseback from the third party purchaser for a period of ten years with a possible renewal option. If the franchisor wanted to preserve the lease-expiration defense to avoid potential PMPA liability, however, under the SLO requirement, it would have to offer the premises to the franchisee. If the franchisee bought the premises, then the franchisor is placed in an untenable position should the franchisee, before the expiration of the underlying lease, engage in misconduct that would justify nonrenewal under one of the provisions of § 2802(b). Suppose, for example, that two years after the sale, the franchisor discovers that the franchisee had been operating the service station in a fraudulent manner for quite some time. Under § 2802(b)(2)(C) and 2802(c)(1), the franchisor would be permitted to terminate the franchise. In the absence of an SLO requirement, the franchisor would have still held a leasehold interest in the premises and could have obtained another franchisee to continue franchise operations at that location for the remaining eight years of the underlying lease, in accordance with the franchisor's original plan. In the posited scenario, however, the franchisee now owns the service station premises as a result of the franchisor's earlier offer made pursuant to the SLO requirement in anticipation of the lease-expiration defense. Thus, the franchisor now faces the very different choice of either ceasing franchise operations eight years before it had intended to do so or tolerating the misconduct of a franchisee that, under the PMPA, it does not have to tolerate. Moreover, if the franchisor does terminate the franchise, nothing in the statute would prevent the franchisee from entering into a franchise relationship with one of the franchisor's competitors. Thus, it is certainly possible that the franchisor could end up losing a favored franchise location to a competitor as the result of the franchisee's own misconduct.

3. The Clerk of the Court is directed to enter judgment in favor of Defendant, and against Plaintiff.