

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-1998

# Patel v. Sun Co Inc

Precedential or Non-Precedential:

Docket 96-2123

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Patel v. Sun Co Inc" (1998). *1998 Decisions.* Paper 75.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/75

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-2123

PRAKASH H. PATEL; SHOBHA P. PATEL, H/W
APPELLANTS

v.

SUN COMPANY, INC.; LANCASTER ASSOCIATES

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 94-cv-04318)

Argued: September 15, 1997

Before: BECKER, Chief Judge, SLOVITER and SCIRICA,
Circuit Judges.

(Filed April 10, 1998)

       DIMITRI G. DASKAL, ESQUIRE
        (ARGUED)
       The Daskal Law Group
       3 Church Circle
       Suite 500
       Annapolis, MD 21401

       Attorney for Appellants

JAMES M. BROGAN, ESQUIRE
 (ARGUED)
CHRISTOPHER W. WASSON,
 ESQUIRE
Piper & Marbury
18th & Arch Streets
3400 Two Logan Square
Philadelphia, PA 19103

VIRGINIA L. ROCKAFELLOW,
 ESQUIRE
RICHARD GAINES,
 ESQUIRE
Sun Company, Inc. (R&M)
Ten Penn Center
1801 Market Street, 17th Floor
Philadelphia, PA 19103

Attorneys for Appellee

OPINION OF THE COURT

BECKER,* Chief Circuit Judge.

Plaintiffs Prakash H. Patel and Shobha P. Patel appeal from an order of the district court granting summary judgment in favor of defendant Sun Company, Inc. ("Sun") in a case brought under the Petroleum Marketing Practices Act, 15 U.S.C. S 2801 et seq. ("PMPA" or "Act"). This litigation has been ongoing since 1988, and the case has been here before, see Patel v. Sun Co., Inc., 63 F.3d 248, 252 (3d Cir. 1995) ("Patel V"). The gravamen of the Patels' complaint, then and now, is that Sun has made an "end run" around a provision of the PMPA that requires service station franchisors like Sun to make bona fide offers to their franchisees before selling the service station premises to a third party. See S 2802(b)(3)(D)(iii)(I).

_____

* Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

2

In 1987, Sun sold the land upon which the Patels had operated their service station for twenty-two years to an unrelated third party, Lancaster Associates ("Lancaster"), without first offering it to them. Sun claims that it was not required to make a bona fide offer to the Patels because it did not terminate their franchise when it sold the property. Instead, Sun took a six year leaseback from Lancaster and did not disturb the Patels' franchise until that lease expired in 1994. Sun contends that six years later it could rely on the "expiration of an underlying lease" provision of the PMPA, see S 2802(c)(4), which allows franchisors to terminate or nonrenew franchises without first making a bona fide offer to their franchisees when the leases underlying the franchise expire.

The Patels offer four alternative theories under which they claim that Sun should be liable for damages for selling the premises to Lancaster without first making a bona fide offer, despite the leaseback arrangement. First, they argue that because the Lancaster-Sun lease was created after the inception of the first franchise agreement between Sun and the Patels, it does not qualify as an "underlying lease" for the purposes of S 2802(c)(4). Therefore, according to the Patels, Sun cannot rely on S 2802(c)(4) to skirt the bona fide offer requirement in S 2802(b)(3)(D)(iii)(I). Second, they contend that, even if the Lancaster-Sun lease technically fits the S 2802(c)(4) definition of an underlying lease, Sun should not be permitted to circumvent the bona fide offer requirements simply by delaying the eventual nonrenewal date through the use of a leaseback. To the extent that the text of the PMPA seems to allow that result, the Patels urge us to close that "unintended loophole" by reading a "sale-leaseback offer requirement" into the Act. Third, the Patels submit that we must inquire into the objective reasonableness of Sun's business decision to avoid the bona fide offer provision by creating the leaseback with Lancaster. Fourth, the Patels assert that, at the very least, Sun's decision to create the leaseback must have been made subjectively "in good faith and in the normal course of business" and not simply to avoid the bona fide offer requirement.

Unfortunately for the Patels, none of their arguments carry the day. Under a plain reading of the unambiguous

3

text of the Act, we find that the definition of "underlying lease" in S 2802(c)(4) is clear, and that it includes leases, like the Lancaster-Sun leaseback, created during the business relationship between the franchisor and franchisee. Additionally, we can find no statutory basis to justify reading into the PMPA new provisions like a "sale leaseback offer requirement" that have no grounding in the Act's text or legislative history. Moreover, our decision in Lugar v. Texaco, Inc., 755 F.2d 53 (3d Cir. 1985), precludes the imposition of an objective reasonableness inquiry into franchisor decisions to terminate or nonrenew franchises based on the underlying lease exception in S 2802(c)(4). Finally, while we agree with the Patels that under Slatky v. Amoco Oil Co., 830 F.2d 476 (3d Cir. 1987) (en banc), courts must engage in a subjective "in good faith and in the normal course of business" review of franchisor decisions to terminate or nonrenew the franchise when an underlying lease expires, we cannot reverse on this ground. This is because we are bound under the doctrine of law of the case by the judgment in Patel V, which found that Sun acted in good faith when it did not renew the Patels' franchise. For all these reasons, the judgment of the district court will be affirmed.

I.

Sun owned a parcel of land in Wayne, Pennsylvania, that contained a commercial office building, a large parking area, and other improvements. Sun leased a small portion of this property to the Patels, who operated a Sunoco service station there for twenty two years pursuant to a series of franchise agreements with Sun. The first post-PMPA agreement between Sun and the Patels began on August 21, 1978.

In December of 1987, Sun sold the entire undivided parcel, which included the Patels' service station on one corner, to Lancaster Associates, an unrelated third party developer. It is not clear from the record whether Sun first offered the property to the Patels, and so for the purposes of summary judgment review we must assume that Sun did not. Lancaster agreed to lease the service station portion of the parcel back to Sun until September 30, 1994. The

4

Lancaster-Sun leaseback did not, however, contain any specific renewal provisions or options granting Sun the right to re-purchase the property.

Sun, upon entering into the leaseback with Lancaster, and as part of their 1988 Franchise Agreement, immediately subleased the service station premises to the Patels for a term of three years. The sublease provided that Sun's right to grant possession of the premises was now subject to the Lancaster-Sun "underlying" lease that would expire on September 30, 1994. The sublease also informed the Patels that the sublease might not be renewed at the end of the lease period. While at no time during the Lancaster sale and leaseback did Sun interrupt the Patels' possession of the service station premises, according to the testimony of Lancaster general partner Bruce Robinson, Lancaster always expected that upon the expiration of the leaseback, the Patels' franchise would not be renewed because Sun had promised to remove the underground fuel tanks and clean up any environmental problems that existed on the property.

In 1991, upon the expiration of the first three-year sublease, Sun and the Patels entered into a second three-year sublease due to expire on August 21, 1994. This sublease, like the first, provided that Sun's right to grant possession of the premises was subject to the underlying Lancaster-Sun lease which would expire on September 30, 1994, and it also informed the Patels that the sublease might not be renewed at the end of the lease period. On April 28, 1994, Sun sent written notification to the Patels that their lease and franchise would not be renewed at the end of the term due to the upcoming expiration of Sun's underlying lease with Lancaster on September 30, 1994.

Beginning in 1988, the Patels filed a series of lawsuits claiming that Sun had effected a constructive termination or nonrenewal of their franchise in violation of the PMPA by not first offering them the right of first refusal on the "leased marketing premises" under the PMPA. See SS 2801(9) and 2802(b)(3)(D). The district court rejected the Patels' contentions in a series of decisions that ultimately concluded that their legal action was premature. The court reasoned that even if it were true that Sun had failed to

5

offer the Patels the premises, the other necessary predicate act (termination or nonrenewal of the lease) had not yet occurred, and indeed, might never occur. See Patel v. Sun Ref. & Mktg. Co., No. 88-3958, slip op. at 1-2 (E.D. Pa. Oct. 14, 1988) ("Patel I"); Patel v. Sun Ref. & Mktg. Co., 710 F. Supp. 1023 (E.D. Pa. 1989) ("Patel II"); Patel v. Sun Ref. & Mktg. Co., No. 88-3958, 1992 WL 25737, at *2 (E.D. Pa. Feb. 7, 1992) ("Patel III"). The Patels did not appeal these decisions.

After receiving the notification of nonrenewal from Sun in 1994, the Patels filed another action, again contending that the nonrenewal violated the PMPA because Sun had sold the property in 1987 without first giving them an offer to purchase it or a right of first refusal. The Patels sought injunctive relief to prevent the nonrenewal as well as monetary damages for Sun's alleged violation of the PMPA. The district court denied the request for injunctive relief because it found that the Patels had not satisfied the S 2805(b)(2) preliminary injunction standard, which requires the franchisee to show "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." Patel v. Sun Co., Inc., 866 F. Supp. 871, 873-74 (E.D. Pa. 1994) ("Patel IV").

In a divided opinion, we affirmed the district court's denial of the injunction, although on different grounds, not reaching the merits determination made by the district court. See Patel V, 63 F.3d at 252. We held that the injunction was barred under S 2805(e)(1), which provides that a court may not compel renewal of a franchise relationship if the basis for the nonrenewal of the relationship was a decision made in good faith and in the normal course of business by the franchisor to sell its interests in the leased marketing premises. See S 2805(e)(1)(A)(iii). We remanded to the district court, however, explaining, "[t]he Patels still have. . . the opportunity to present to the district court their contention that the nonrenewal of their franchise violates S 2802 because the reason given for the nonrenewal, the expiration of the underlying lease, was a condition created by the franchisor when it sold the property without offering the franchisee an opportunity to purchase it." Patel V, 63 F.3d at 253.

6

On remand, both parties moved for summary judgment, and the district court granted summary judgment in favor of Sun. See Patel v. Sun Co., Inc., 948 F. Supp. 465 (E.D. Pa. 1996) ("Patel VI"). The Patel VI court held that Sun could refuse to renew the Patels' franchise without liability, based upon the underlying lease exception in SS 2802(b)(2)(C) and 2802(c)(4). The district court relied upon our reasoning in Lugar, 755 F.2d at 53, and held that the underlying lease exception was not subject to any judicial inquiry into the circumstances surrounding Sun's decision to sell and leaseback the premises. See Patel VI, 948 F. Supp. at 473 n.3.

The Patels appealed again, and the long-running saga of "the Patels versus Sun" returns to this court anew. Section 2805(a) of the PMPA confers jurisdiction on the federal courts and creates a civil cause of action against franchisors for violations of the substantive sections of the Act. Section 2805(d) provides for the award of actual and exemplary damages, as well as reasonable attorney and expert witness fees to a franchisee who prevails against a franchisor in a civil action under the Act. Because our standard of review is plenary, see Kelly v. Drexel Univ., 94 F.3d 102, 104 (3d Cir. 1996), we apply the same test the district court should have applied in the first instance. See Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir. 1995). We must determine, therefore, whether the record, when viewed in the light most favorable to the Patels, shows that there is no genuine issue of material fact and that Sun was entitled to summary judgment as a matter of law. See, e.g., Olson, 101 F.3d at 951; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

II.

A.

The PMPA regulates the relationship between franchisors, motor fuel refiners and distributors, and their franchisees, principally retail gas station operators. Many of these

franchisees (like the Patels) lease their station premises from franchisors who (like Sun), own the premises. In 1978, after examining this relationship and determining that legislative protection for franchisees was necessary, Congress enacted the PMPA. Congress passed this legislation in large part because it was concerned that franchisors had been using their superior bargaining power to compel compliance with certain marketing policies and to gain an unfair advantage in contract disputes. See Slatky, 830 F.2d at 478 (citing S. Rep. No. 731, 95th Cong., 2d Sess. 17-19, reprinted in 1978 U.S.C.C.A.N. 873, 875-77) ("Senate Report"); Patel V, 63 F.3d at 250. In addition, Congress wanted to protect franchisees from "arbitrary or discriminatory terminations and non-renewals." Senate Report at 18, 1978 U.S.C.C.A.N. 877. As we noted in Slatky, when it passed the PMPA:

> Congress determined that franchisees had a "reasonable expectation[]" that "the [franchise] relationship will be a continuing one." The PMPA's goal is to protect a franchisee's "reasonable expectation" of continuing the franchise relationship while at the same time insuring that distributors have "adequate flexibility . . . to respond to changing market conditions and consumer preferences."

830 F.2d at 478 (citing the Senate Report at 18-19).

The PMPA prohibits franchisors from terminating or nonrenewing franchises except under certain prescribed situations. See S 2802(a). It also enumerates a series of grounds that permit a franchisor to terminate or nonrenew one of its franchisees without PMPA liability. See S 2802(b). These bases can be roughly separated into two categories: franchisee misconduct1 and legitimate franchisor business

_____

1. For example, the Act permits the franchisor to terminate or nonrenew a franchise if the franchisee fails to pay sums due under the franchise agreement, see S 2802(b)(2)(C) (incorporating S 2802(c)(8)); if the franchisee engages in fraud or criminal misconduct relevant to the operation of the property, see S 2802(b)(2)(C) (incorporating S 2802(c)(1));
if the franchisor receives "numerous bona fide customer complaints" about the franchisee's operation of the property, see S 2802(b)(3)(B); or if
the franchisee fails to operate the property in a "clean, safe, and healthful manner," see S 2802(b)(3)(C).

8

decisions. In this case, only the latter, which are designed to ensure that franchisors maintain their ability to adjust to changing market conditions, are implicated.

Among the acceptable business reasons for franchisee termination or nonrenewal (assuming that certain conditions in the Act are met) are the franchisor's decision to leave the geographic market area, see S 2802(b)(2)(E); failure of the franchisor and franchisee to agree in good faith and in the normal course of business to changes or additions to the franchise agreement, see S 2802(b)(3)(A); conversion of the property to a use other than sale of motor fuel, see S 2802(b)(3)(D)(i)(I); material alteration of the property, see S 2802(b)(3)(D)(i)(II); sale of the premises, see S 2802(b)(3)(D)(i)(III); unprofitability of the franchise, see S 2802(b)(3)(D)(i)(IV); loss of an underlying lease, see S 2802(b)(2)(C) (incorporating S 2802(c)(4)); and loss of franchisor's right to grant the trademark which is the subject of the franchise, see S 2802(b)(2)(C) (incorporating S 2802(c)(6)). Of these possible "business reason" exceptions, only two -- the sale of the premises and the loss of an underlying lease -- are the subject of this appeal. We therefore set out their requirements in greater detail.

First, under S 2802(b)(3)(D)(i)(III), a franchisor may terminate or nonrenew a franchisee if the franchisor determines "in good faith and in the normal course of business" to sell the property. To qualify for this exception to the general prohibition against terminations or nonrenewals, however, the franchisor's purpose cannot be to convert the property to direct management by its own employees or agents. See S 2802(b)(3)(D)(ii). Moreover, the franchisor must have made either a bona fide offer to sell the property to the franchisee, or, if applicable, have provided the franchisee a right of first refusal on an offer made to a third party. See S 2802(b)(3)(D)(iii).

Second, a franchisor may terminate or decline to renew a franchise agreement upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which . . . nonrenewal of the franchise is reasonable." S 2802(b)(2)(C). Section 2802(c) expands on the general statement in S 2802(b)(2)(C) by enumerating a non-exclusive list of events that qualify as "relevant". Included

9

in this list is "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease." S 2802(c)(4). In 1994, Congress amended this exception by requiring a franchisor to offer to assign to the franchisee "any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor" when certain conditions are satisfied. See Petroleum Marketing Practices Act Amendments of 1994, Pub. L. No. 103-371, sec. 3, S 102(c)(4), 108 Stat. 3484, 3484 (codified at 15 U.S.C. S 2802(c)(4)(B)). As there were no options in the Lancaster-Sun lease, that provision is not relevant to our decision here. We will, however, discuss the import of this amendment on our PMPA jurisprudence infra.

B.

The Patels' overarching argument is that if Sun is allowed to prevail here, it will have made a successful "end run" around the bona fide offer requirement contained in the sale exception to the PMPA's general rule prohibiting franchise nonrenewal. To evaluate this argument, it is necessary to understand the interplay between SS 2802(b)(3)(D) and 2802(c)(4) (as incorporated by S 2802(b)(2)(C)). As we have explained, S 2802(b)(3)(D) requires that a franchisor make "a bona fide offer to sell, transfer, or assign to the franchisee [his] interests" in the leased marketing premises when the franchisor decides not to renew the franchise relationship before it sells the property to a third party. Thus, the Act contemplates a two-event trigger to activate the bona fide offer requirement -- a sale of the property and a termination or nonrenewal of the franchise.

In the ordinary case, the sale and the nonrenewal occur together, and there is no question that the franchisor must make a bona fide offer or grant a right of first refusal to the franchisee before selling to avoid liability under the Act. But the circumstances here are not "ordinary". In 1987, Sun's sale of the premises did not lead immediately to its failure to renew the Patels' franchise. Rather, Sun took a leaseback from Lancaster and renewed the Patels' franchise for not just one, but for two additional three year terms. Thus,

10

when Sun sold the property to Lancaster, there was no nonrenewal, and the courts in Patel I-III, supra held that the right of first refusal and bona fide offer requirements of S 2802(b)(3)(D)(iii) had not yet been triggered. The Patels were told, in effect, to wait and see if their franchise would be terminated in the future. See Patel III, 1992 WL 25737 at *2 ("At this point in time, they have not been subjected to a termination or non-renewal of their franchise. If such an event occurs, plaintiffs will have the protection of the PMPA at their disposal."). The Patels did not appeal these decisions.

Barring another exception in the PMPA, Sun could not have avoided liability under the PMPA when it ultimately decided to nonrenew the Patels just because that nonrenewal was delayed through the use of a leaseback (or any other device). This is so, because the default regime of the Act is that all terminations or nonrenewals are unlawful unless otherwise excepted. See S 2802(a). In this case, however, when Sun actually failed to renew the Patels' franchise in 1994, it contended that a different provision -- S 2802(c)(4) -- shielded it from PMPA liability, because the expiration of the Lancaster-Sun lease now qualified as a relevant event under S 2802(b)(2)(C). Therefore, in Sun's view, the sale exception (with its bona fide offer requirement) no longer was relevant, for it could now rely on the underlying lease exception (which had no bona fide offer requirement). These are the mechanics of the "end run" of which the Patels complain.

The Patels maintain that the district court should not have interpreted the PMPA to permit a franchisor to evade the bona fide offer requirement so easily, and they advance several theories why Sun should be liable for damages (they no longer seek injunctive relief).

1.

First, the Patels submit that the language of S 2802(c)(4) itself prohibits franchisors from creating and using leasebacks to avoid PMPA liability. They contend that a lease cannot be an "underlying lease" for the purposes of S 2802(c)(4) unless it predates the business relationship

11

between the franchisor and franchisee (in other words, the lease must predate the creation of the initial franchise between the parties).2 The Patels argue that a lease that merely predates the existing franchise, like the Lancaster–Sun leaseback in this case, should not be treated as an "underlying lease" because that would permit the subversion of the bona fide offer provision contained in the sale exception.

We turn initially to the language of S 2802(c)(4) to determine what Congress intended by the term "underlying lease". The provision reads:

> As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as --
>
> * * *
>
> (4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise -- (A) of the duration of the underlying lease, and (B) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of

_____

2. In the text, we use the words "business relationship" instead of the perhaps more common-sensical term "franchise relationship" because we wish to avoid any confusion with that term as it is defined in S 2801(2). Our use of "business relationship" is intended to connote the entire relationship between the franchisor and the franchisee, beginning with the inception of the first franchise agreement and ending with the termination or nonrenewal of the final franchise agreement. "Franchise relationship", in contrast, is defined in S 2801(2) as "the respective motor
fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." Technically, a "franchise relationship", as it is defined in the PMPA, is tied to the franchise agreement, which the PMPA contemplates will periodically be modified and renewed. As that is not the idea we are trying to convey here, we have selected the term "business relationship".

12

termination) or at the end of such term (in the case of nonrenewal);[3]

There is no definition in the Act itself of the term "underlying lease". See S 2801. But the term "franchise" is defined, and it helps us determine what Congress meant by "underlying lease". A franchise is defined as "any contract between a refiner and a distributor, between a refiner and a retailer, . . . under which a refiner or distributor . . . authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner . . . ." S 2801(1)(A). It includes "any contract under which a retailer or distributor . . . is authorized or permitted to occupy leased marketing premises . . . in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner . . . ." S 2801(1)(B)(i). The statute contemplates that the franchise will be renewed (and perhaps modified) many times during the life of the business relationship between the franchisor and the franchisee. Indeed, other sections of the PMPA anticipate a series of relatively short franchise terms between the franchisor and franchisee. Section 2802(b)(2)(E), for example, permits the franchisor to terminate or nonrenew a franchise based upon a decision in good faith and in the normal course of business to withdraw from the relevant geographic market area, so long as the franchise term is three years or longer.

Examining the use of the term "franchise" in the context of S 2802(c)(4), particularly the notification provision, the Patels' contention that an underlying lease must predate the business relationship between the franchisor and the franchisee must be incorrect. Under S 2802(c)(4), the expiration of an "underlying lease" qualifies as a relevant

_____

3. This is the pre-October 1994 version of the statute. It applies here because both the 1987 sale and the 1994 nonrenewal occurred prior to the amendments enacted in that year. We note that the current version of S 2802(c)(4) contains a new subsection (B). The amendment modifies the relevant language quoted above only insofar as Congress moved all of the language in subsection (B) quoted above into the new subsection (A) and added new subheadings. See infra page 21.

event exception "if the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise." S 2802(c)(4) (emphasis supplied). This language leaves no doubt that Congress anticipated that an underlying lease could arise during the business relationship, thereby requiring the franchisor to notify the franchisee "prior to the commencement of the then existing franchise" in which the franchisor decides to terminate (or nonrenew) the franchise. If Congress had intended otherwise, the statute would logically have been written to require the franchisor to notify the franchisee prior to the "inception of the initial franchise" or the "existence of any business relationship between the franchisor and the franchisee," rather than the "then existing franchise." The words "then existing" are clear and they indicate to us that a qualifying underlying lease under S 2802(c)(4) could arise during the business relationship, so long as the franchisor notifies the franchisee before they enter into the next franchise agreement. Moreover, since the term "franchise" is used repeatedly throughout the PMPA, and is a defined term in S 2801, Congress's choice of language in S 2802(c)(4) cannot be ignored by this Court, even given the strong pro-franchisee tenor of the PMPA and its legislative history. See generally, Slatky, 830 F.2d at 478, 483; Patel V, 63 F.3d at 250.

In sum, the plain meaning of the language in S 2802(c)(4), when read in context, is clear and we are bound by it. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (" `The plain meaning of legislation should be conclusive, except in rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' ") (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)). The term "underlying lease" refers to leases which underlie the franchise term, but not necessarily the entire business relationship between the franchisor and franchisee. Therefore, under the facts of this case, the Lancaster-Sun leaseback was an underlying lease for the purposes of S 2802(c)(4) and potentially qualified Sun for an exception to PMPA liability.

14

2.

The second theory offered by the Patels is that, even if the Lancaster-Sun leaseback falls within the statutory definition of an "underlying lease" in S 2802(c)(4), we should simply read a new provision -- a so-called "sale-leaseback bona fide offer requirement" -- into the PMPA, see Patel VI, 948 F. Supp. at 473, even though such a provision does not exist anywhere in the text or the legislative history of the statute. The Patels argue that, given our interpretation of Congress's intent to protect the "franchisee's reasonable expectations of continuing the franchise" and to "assure the franchisee an opportunity to continue to earn a livelihood from the property," see Slatky, 830 F.2d at 478, 484, Sun's actions are fundamentally at odds with the underlying purpose of the PMPA. In their view, Congress inadvertently left a "loophole" in the PMPA when it included a bona fide offer requirement under the sale provision in S 2802(b)(3)(D)(iii)(I), but left one out of the underlying lease provision in SS 2802(b)(2)(C) and 2802(c)(4). The Patels maintain that we would be justified in closing up this "loophole" by judicial fiat, because it allegedly permits unscrupulous franchisors to evade the bona fide offer requirement that Congress imposed on franchisors who wish to sell their leased marketing premises out from under their franchisees.

The Patels carry a heavy burden in trying to convince us that the underlying purposes of the PMPA are so clear and conclusive that they justify our imposition of an additional requirement which, even the Patels admit, does not exist in the plain language of the statute. See Ron Pair, 489 U.S. at 242. We have been down this path before and have consistently rejected the requests of the Patels and others to craft new protections eliminating so-called "gaps" in the PMPA. Most recently, in the course of this very litigation, we explained that "gap[s] in the provisions of the PMPA . . . should be corrected by Congress if Congress decides that [they] undermine its intent in passing the PMPA." Patel V, 63 F.3d at 253 (discussing the interrelationship between the underlying lease and the sale provisions, the same sections of the statute at issue here). Moreover, our position in Patel V was not novel. In Lugar, for example, we admitted

15

that while there may be many strong policy reasons to read new pro-franchisee provisions into the PMPA, it was Congress's responsibility to weigh the competing interests and make those determinations. See 755 F.2d at 59 ("[W]e cannot impose th[e] obligation [requiring franchisors to assign purchase options to their franchisees] where Congress did not.").4

Where Congress has "undert[aken] the delicate task of balancing the competing interests of fuel franchisors and their dealers," see id., we cannot impose new obligations on franchisors without any statutory basis simply because we prefer them, or because there are strong policy reasons for their adoption, or because they are pro franchisee. In the context of a detailed statutory structure such as the PMPA, we simply need much more evidence to satisfy us that "literal application of [the] statute will produce a result demonstrably at odds with the intentions of its drafters." Griffin, 458 U.S. at 571. The Act clearly says that a franchisor may rely on the expiration of an underlying lease as a valid exception to liability under the PMPA, so long as the franchisee is notified "prior to the commencement of the term of the then existing franchise."S 2802(c)(4) (emphasis supplied); see S II.B.1 supra. For the same reasons that we are convinced that the Lancaster-Sun leaseback qualifies as an "underlying lease" under S 2802(c)(4), we cannot conclude that Congress inadvertently omitted creating a bona fide offer requirement from the underlying lease exception in (c)(4) when the lease is created during the business relationship between the franchisor and the franchisee.

As discussed above and detailed in Slatky, the PMPA was created to balance the needs of franchisees, who have a

_____

4. We note in this regard that the oil franchisees have demonstrated their ability to get Congress's attention. See , e.g., S 2802(c)(4) (as amended 1994) (overturning our precedent in Lugar that permitted franchisors to rely on the expiration of an underlying lease defense to avoid PMPA liability even when their expiring leases contained unexercised options to renew or purchase that had never been offered to the franchisee); see also H.R. Rep. No. 737, 103d Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 2779; S. Rep. No. 387, 103d Cong., 2d Sess. (1994), available at 1994 WL 534750.

" `reasonable expectation' of continuing the franchise relationship" if they do not engage in any misconduct, with the needs of the franchisors, who need " `adequate flexibility . . . to respond to changing market conditions and consumer preferences.' " 830 F.2d at 478 (quoting Senate Report at 19). Given these competing goals that Congress attempted to balance, we cannot conclude that the lack of a sale-leaseback bona fide offer requirement is "demonstrably at odds" with the rest of the PMPA. In fact, it appears to fit in comfortably with the rest of the provisions of the Act whose purpose it is to maintain franchisor flexibility to respond to new competitive conditions. Accordingly, we decline the Patels' entreaties to read new provisions in the PMPA that are plainly absent from the text of the statute and its legislative history.

3.

Sun contends that once we have defined the term "underlying lease" to include the Lancaster-Sun leaseback and rejected the Patels' suggestions to read new pro-franchisee provisions into the text of the PMPA, we must affirm the district court's grant of summary judgment in its favor. In its submission, all of the events in S 2802(c), including the "underlying lease" exception, are per se reasonable, obviating the ability of the courts to review the circumstances of the creation and expiration of underlying leasebacks. To Sun, this per se status means we may conduct neither an objective nor a subjective inquiry into the events and decisions surrounding the creation of the Lancaster-Sun leaseback and the nonrenewal of the Patels' franchise under S 2802(c)(4).5 While we agree with Sun that

_____

5. An objective inquiry would require us to examine the reasonableness of Sun's decision to sell the leased marketing premises to Lancaster and take a six year leaseback, without first offering it to the Patels, as viewed
from the perspective of a reasonable business person charged with making such decisions. Application of this standard would obviously be quite onerous because it would necessitate our reviewing and second-guessing the substantive merits of Sun's business decisions about where and how to best market its product. A subjective inquiry, however, would clearly be less intrusive from Sun's perspective because it only would

17

a franchisor's reliance on S 2802(c)(4) is not subject to an objective reasonableness test, we nevertheless also conclude that its decision must be subjectively "in good faith and in the normal course of business" to qualify for the "underlying lease" exception. Here, however, since the Patels have produced insufficient evidence to show bad faith on Sun's part in either creating the Lancaster-Sun leaseback or allowing it to expire, we ultimately conclude that Sun can avoid PMPA liability for nonrenewing the Patels' franchise under the "underlying lease" exception in S 2802(c)(4).

a.

First, we deal with the question whether S 2802(c)(4) is subject to an objective reasonableness test. We preface this discussion with the acknowledgment that Sun's submission that all of the S 2802(c) events are per se reasonable is meritless. There is no question that at least some of the S 2802(c) relevant event exceptions mandate some form of judicial scrutiny. See Sun Refining & Mktg. Co. v. Rago, 741 F.2d 670, 673 (3d Cir. 1984) ("[I]n light of the Act's specific intent to benefit franchisees, we decline to construe S 2802(c) as a per se termination rule favoring franchisors."); Lugar, 755 F.2d at 59 (recognizing that a reasonableness inquiry into certain enumerated events under S 2802(c) dealing with franchisee misconduct was proper, but refusing to extend that rationale to S 2802(c)(4)); accord Marathon Petroleum v. Pendleton, 889 F.2d 1509, 1512 (6th Cir. 1989) ("[W]e must scrutinize the reasonableness of terminations even when an event enumerated in S 2802(c) has occurred.").

Sun's contention that courts are not authorized to second guess franchisors' decisions pursuant to the underlying lease exception in S 2802(c)(4) is grounded in our holding in

_____

require us to probe into Sun's state of mind when it decided to create an underlying leaseback with Lancaster. Under this standard, our focus would be on whether the franchisor entered into the leaseback for normal business reasons or simply in an effort to avoid the sale exception's bona fide offer requirement in S 2802(b)(3)(D)(iii)(I).

18

Lugar that there is no statutory basis to inquire into the objective reasonableness of franchisor business decisions made in conformity with S 2802(c)(4). See 755 F.2d at 58. The Patels challenge the viability of Lugar, arguing that the decision is in conflict with our earlier opinion in Rago, 741 F.2d at 673 (holding that the enumerated events in S 2802(c) are not per se reasonable), and that the 1994 Amendment to S 2802(c)(4) not only overturned Lugar's result, but also fatally undermined its reasoning. We disagree.

In Lugar, the franchisor, Texaco, had been leasing its gas station premises from a third party owner. Texaco in turn entered into a series of subleases with plaintiff Howard Lugar, its franchisee. The underlying lease granted Texaco an option to renew and an option to purchase the property at its expiration. When the underlying lease expired, Texaco opted neither to renew it nor purchase the premises from the third party owner. Texaco then informed Lugar that it was not renewing his franchise based upon the expiration of the underlying lease. Lugar asked Texaco to assign its options to him, so that he could continue his business at the same location, but Texaco refused and claimed protection from PMPA liability under S 2802(c)(4), the underlying lease exception. See Lugar, 755 F.2d at 54.

Lugar sued, alleging that Texaco's reliance on S 2802(c)(4) was unreasonable because Texaco should at least have assigned its options to him. In effect, Lugar asked the Court to make an objective evaluation of the reasonableness of Texaco's business decision to refuse to assign him its options to renew the lease and purchase the property. We held that because Texaco's nonrenewal fit within S 2802(c)(4), an enumerated relevant event, the Act precluded us from evaluating the reasonableness of Texaco's action. See id. at 58.

In Rago, in contrast, the plaintiff had been operating a service station for eight years under a series of franchise agreements with the same franchisor. With two years remaining before the expiration of the then existing franchise agreement, the franchisor sent Rago a letter informing him that it intended to terminate his franchise. The franchisor's stated reasons were that Rago had failed to

19

operate the station for a period of ten consecutive days and also that he had failed to pay rent and other sums due the franchisor in a timely manner. See Rago, 741 F.2d at 671. The franchisor relied on SS 2802(c)(8) and (9)(A) to avoid PMPA liability.[6] Although the franchisee had committed a literal violation of these provisions, we held that S 2802(c) was not a per se termination rule and proceeded to analyze whether the circumstances surrounding the Rago's failures made it reasonable for the franchisor to terminate his franchise. See id. at 674.

Contrary to the Patels' reading of Lugar and Rago, we perceive no conflict between the two opinions. As the panel in Lugar made clear, there is a patent difference between S 2802(c)(4), which deals with nonrenewal based upon a franchisor business judgment, and SS 2802(c)(8) and (9)(A), which concern nonrenewals based upon franchisee misconduct. Specifically, because (c)(8) and (9)(A) deal with "failures" by franchisees to do certain things (e.g., pay money in a timely manner and operate the service station for ten consecutive days), they therefore necessarily implicate S 2801(13), which defines the term "failure". See Lugar, 755 F.2d at 58 n.3. Because the term "failure" under the PMPA does not include "any failure for a cause beyond the reasonable control of the franchisee," S 2801(13)(B)

_____

6. Sections 2802(c)(8) and (9) allow the franchisor to terminate or nonrenew a franchisee for franchisee misconduct. In the context of S 2802(c), they read:

> As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as --

* * *

> (8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;
> (9) failure by the franchisee to operate the marketing premises for --

> (A) 7 consecutive days, or
> (B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time; . . .

(emphasis supplied), the Rago panel was undoubtedly correct to question whether there were any reasonable excuses justifying Rago's failures to keep his station open and pay his rent on time. Similarly, because S 2802(c)(4) justifies nonrenewal on the basis of the expiration of an underlying lease, not a franchisee "failure", the Lugar panel's refusal to engage in a reasonableness inquiry is equally understandable.

Nor are we convinced by the Patels' argument that the 1994 Amendment to S 2802(c)(4), which disturbed our result in Lugar, constitutes a legislative repeal of its rationale. Under the amendment, franchisors must now offer to assign to their franchisees all options to extend underlying leases as well as any options to purchase the marketing premises, when certain conditions are met. See S 2802(c)(4)(B) (as amended 1994).7  While Sun concedes that the amendment overrules Lugar's result, it submits that Lugar's reasoning remains intact. If anything, Sun contends, because the amendment only narrowly revised S 2802(c)(4), and did not specifically require courts to evaluate the objective reasonableness of franchisor decisions not to renew franchises based upon the expiration of underlying leases, Congress implicitly approved Lugar's reasoning and simply clarified the circumstances when the expiration of an underlying lease is statutorily reasonable. While this question is difficult, because we find nothing in the text of the amendments or in the accompanying legislative history to the contrary, see H.R. Rep. No. 737, 103d Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 2779; S. Rep. No. 387, 103d Cong., 2d Sess. (1994), available at 1994 WL 534750; 140 Cong. Rec. H10,575–76 (daily ed. Oct. 3, 1994); 140 Cong. Rec. H10,735 (daily ed. Oct. 4, 1994); 140 Cong. Rec. S14,236–37 (daily ed. Oct. 5, 1994), we believe Sun's characterization of Congress's intent to be more plausible, and we reject the Patels' attempts to graft a reasonableness test onto S 2802(c)(4) in direct conflict with our existing precedent. Therefore, we find that the 1994 Amendment to S 2802(c)(4) did not disturb our holding in Lugar that there is no objective reasonableness test under that section.

_____

7. Because of its length, we do not rescribe that amendment here.

21

b.

Our analysis of S 2802(c)(4) is not yet complete, however, because Sun contends that not only can there be no objective reasonableness inquiry into business decisions made pursuant to this section, but also that there can be no judicial inquiry whatever. The Patels, in contrast, urge that, based upon our decision in Slatky, we must consider whether Sun created the leaseback with Lancaster subjectively "in good faith and in the normal course of business."

In Slatky, the franchisee had leased his gas station from Amoco for several years. After Slatky's sales had declined, Amoco decided not to renew his franchise on the ground that renewal would be uneconomical. To avoid PMPA liability, Amoco based its nonrenewal on S 2802(b)(3)(D)(i)(IV), which allows nonrenewal when "renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee." This provision, like the sale of the marketing premises provision, requires the franchisor to make a bona fide offer to sell the premises to the franchisee. See S 2802(b)(3)(D)(iii)(I).

In an attempt to satisfy this requirement, Amoco offered to sell the property to Slatky at what Slatky claimed was an unreasonable price, one significantly higher than the property's fair market value. See Slatky, 830 F.2d at 480. Amoco contended that to qualify as a "bona fide offer", it need only have made a subjectively sincere offer in good faith. Slatky countered that the offer must have been objectively reasonable. As the provision had no explicit standard, we conducted an independent inquiry into the bona fide offer requirement and, utilizing the logic discussed below, determined that an objective reasonableness standard applied.

We reasoned as follows. Since the PMPA is a remedial statute, enforcement of its provisions demands at least a minimal level of judicial involvement. With the enactment of the statute, Congress outlawed all franchisee terminations and nonrenewals generally, but then created certain

22

exceptions. Congress bifurcated these exceptions into two broad categories: (1) franchisee misconduct, and (2) franchisor business judgments. See id. at 481; see also supra S II.A. The Act generally contemplates an objective reasonableness inquiry into terminations and nonrenewals based upon franchisee misconduct, and a subjective "in good faith and in the normal course of business" inquiry into franchisor business judgment cases. See id. We examined provisions which, like the bona fide offer requirement, did not contain explicit standards for judicial inquiry and determined that the courts must first categorize them in order to determine the proper inquiry. Ultimately, we concluded that since the determination of an offer price pursuant to the bona fide offer requirement was not a business determination, but rather a decision made by the franchisor "only because the statute requires it to do so," it was more akin to a franchise misconduct provision. We therefore applied an objective reasonableness standard. See id.

In assessing the impact of our analysis in Slatky, it is critical to understand that although we noted (and enforced) the legislative intent to distinguish between franchisee misconduct and franchisor business decisions, our decision was predicated on the fact that both types of decisions warranted some type of judicial inquiry. Although Slatky concluded by applying an objective standard to the provision it considered, the impact of its analytical framework here is to mandate the application of a subjective good faith standard to the franchisor's decision to create a leaseback under S 2802(c)(4). As with the bona fide offer requirement at issue in Slatky, the underlying lease provision contains no explicit judicial inquiry standard. Therefore, we look to the nature of that provision to determine what standard is appropriate, and conclude that the decision to create an underlying lease (by selling the leased marketing premises and entering into leaseback) is a franchisor marketing decision (not unlike the decisions to sell the premises or withdraw from the relevant geographic market area). In contrast with the bonafide offer requirement, it is not based upon "a right created by the PMPA," and it is not analogous to a situation where a franchisee is terminated or nonrenewed for misconduct. See

23

Slatky, 830 F.2d at 481. Therefore, the underlying lease provision contained in S 2802(c)(4) warrants the more lenient "in good faith and in the normal course of business" inquiry, not the objective reasonableness standard that is reserved for franchisor non-business decisions.

Our conclusion that S 2802(c)(4) requires the franchisor to act in good faith and in the normal course of business is buttressed by the legislative history. The Senate Report states:

> Expiration of the underlying lease could occur under a variety of circumstances including, for example, a decision by the franchisor not to exercise an option to renew the underlying lease. However, it is not intended that termination or nonrenewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of the expiration of which no substantive change in control of the premises results.

Senate Report at 38, 1978 U.S.C.C.A.N. 896 (emphasis supplied). This passage illustrates several important points. First, Congress could not have meant S 2802(c)(4) to be a per se termination rule because Congress has specifically pointed out in the Senate Report at least one instance where the expiration of an underlying lease will not excuse the franchisor from liability for nonrenewing or terminating a franchise. Sun's argument that the preceding "snippet" of legislative history is consistent with a per se termination rule under S 2802(c)(4) (because it only says that non-arms length leases are not covered) is unconvincing -- either S 2802(c)(4) is a per se rule or it is not, and Congress has told us that it is not.

Moreover, this legislative history seems to posit the kind of nonrenewal that appears to have occurred in Lugar (and, indeed in every other S 2802(c)(4) underlying lease case cited by Sun) -- namely, the expiration of an underlying lease that predates the inception of the business relationship between the franchisor and franchisee.8 The

_____

8. The viability of a limited-in-scope good faith test was not discussed in
Lugar, and application of one here would arguably be in tension with

24

legislative history does not, however, seem to contemplate a situation where (as here) the franchisor creates the "underlying lease" by selling the premises out from under the franchisee and taking a leaseback. Therefore, while the language of the statute permits these kinds of leasebacks, see S II.B.1 supra, given the potential for abuse, unfairness, and arbitrariness such practices could engender, we believe that this is exactly the sort of situation in which Congress sought to protect franchisees from franchisor bad faith. See Slatky, 830 F.2d at 482 (noting that the PMPA requires a good faith inquiry into franchisor business decisions to prevent sham transactions) (citing Senate Report at 37, U.S.C.C.A.N. at 896).

Accordingly, we hold that, in the narrow circumstance where a franchisor has created a underlying lease through a sale-leaseback that takes place after the creation of the business relationship between the franchisor and franchisee, a subjective "in good faith and the normal

_____

some of our language in that opinion, see, e.g., Lugar, 755 F.2d at 58 ("It
is of some significance that even where Congress did subject certain
franchisor's decisions to judicial scrutiny, it eschewed a broad
`reasonable business judgments' test," and instead adopted a two-fold in
good faith and in the normal course of business test.). Lugar is
distinguishable, however, because the underlying lease at issue there
differed in an important way from the Patels' lease in that it predated
the
entire business relationship between Lugar and Texaco, rather than just
the then extant franchise term. See Lugar, 755 F.2d at 54. Since Lugar
knew that Texaco was leasing the property from a third party (and also
knew that the lease might expire during his franchise relationship) when
he first decided to contract with Texaco, the Court did not have to
consider the possibility that Texaco might have acted in bad faith in
creating the underlying lease. In contrast, since Sun created the lease
during the franchise relationship here, it is at least conceivable that
Sun
could have done so in a bad faith effort to avoid the bona fide offer
requirement of the sale exception. While the Patels' efforts to show that
Sun acted in bad faith or outside of the ordinary course of business fail
here, see infra, given the right factual predicate, a future plaintiff
might
prevail on this theory. Moreover, while the cited language might be read
to indicate that the Lugar panel believed that S 2802(c)(4) was not one of
the provisions to which Congress meant to apply the two-fold subjective
test, the objective reasonableness issue was the only one before the
Court.

course of business" inquiry should be applied under S 2802(b)(2)(C) and S 2802(c)(4), before the franchisor will be exempted from liability under the PMPA when its franchisor challenges the nonrenewal of its lease. If this inquiry is to have any effect at all, it must include the circumstances surrounding both the creation of the underlying lease and its eventual expiration. We can hypothesize several instances in which franchisor conduct at the time it created the underlying lease would not satisfy this test and therefore would not qualify under S 2802(c)(4). Most obviously, as specifically contemplated in the legislative history, a franchisor who failed to make a bona fide offer to its franchisee would be liable for damages under the PMPA if it sold the leased marketing premises and created an underlying lease as part of a sham transaction that was not at arms length. Also, an inference of bad faith could be drawn by the fact finder if the franchisor executed a sale with a very short-term leaseback (on the order of a few months) and then attempted to terminate the franchisee without liability based on that extremely short underlying lease. Or, a court could find bad faith if the franchisor used the sale-leaseback gambit to terminate one franchise, only to enter into a new agreement with a different franchisee. Finally, an inference of bad faith might properly be drawn if the fact finder concluded that the franchisor intended to terminate the business relationship when it sold the premises, but that it took a leaseback (of any duration) simply to avoid the bona fide offer requirement.

4.

The Patels have alleged neither a sham transaction nor a suspiciously short leaseback, and Sun has not entered into a new franchise agreement to market motor fuel at the Patels' old franchise location with different franchisees. In fact, the only evidence the Patels put forth that might support a claim of bad faith is Lancaster general partner Bruce Robinson's testimony that Sun intended to terminate their franchise in 1987 at the time of the sale. The district court, however, found that this was insufficient evidence of bad faith to create a triable issue of fact. See Patel VI, 948 F. Supp. at 475-76 & 477 n.6 ("No evidence has been

26

shown that Sun acted out of any bad faith desire to defeat the Patel's rights under the PMPA."). Given that Sun leased the premises to the Patels for over six years after selling it to Lancaster, this slender reed would not seem to be enough to satisfy the Patels' burden opposing summary judgment had we been presented with this issue in the first instance. See Anderson, 477 U.S. at 248-49 (noting that the non-moving party creates a genuine issue of material fact only by providing sufficient evidence to allow a reasonable jury to return a verdict in his favor).

Moreover, as we have already noted, a previous panel of this Court has already definitively ruled on the question of Sun's bad faith, and we are bound by its decision as law of the case. In Patel V, the panel denied a motion by the Patels for a preliminary injunction based upon S 2805(e)(1), which "bars an injunction that would require a franchisor to continue a franchise in a location which the franchisor, in good faith and in the normal course of business, has decided to sell." 63 F.3d at 252. By grounding its affirmance in S 2805(e)(1), the prior panel a fortiori also concluded that the transaction was made in good faith and in the normal course of business. See id. at 253 & n.8. This determination by an earlier panel constitutes the law of the case, and we are barred from reconsidering it. See Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 112 F.3d 652, 663 (3d Cir. 1997) (citations omitted).9

C.

The Patels make one final argument that merits our analysis. They contend that the prior panel, while rejecting their request for injunctive relief, also decided the merits of the damage claim in their favor. The Patels base this contention on the next to the last paragraph in Section

_____

9. There are three traditional exceptions to this doctrine, including situations in which: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice. See Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 116-17 (3d Cir. 1997) (citations omitted). None of these apply.

III(B) of Patel V. See 63 F.3d at 253. There, the majority stated:

> Clearly, one cannot help but feel some sympathy for the Patels. At the time of their initial attempt to obtain injunctive relief, they were sent away and told to seek such relief when their franchise was not renewed. Now, having returned to court after the occurrence of the nonrenewal, they are told that they are not eligible for injunctive relief. The Patels still have, however, the opportunity to present to the district court their contention that the nonrenewal of their franchise violates S 2802 because the reason given for nonrenewal, the expiration of the underlying lease, was a condition created by the franchisor when it sold the property without offering the franchisee an opportunity to purchase it. Even if injunctive relief is no longer available to the Patels, the PMPA does provide for awards of damages and fees to a franchisee who is successful in a civil action against a franchisor. 15 U.S.C. 2805(d) and (e).

Id. In the footnote following this passage, the Patel V majority continued:

> The dissent states that "[t]he majority holds that the franchisor's obligation to offer to sell to the franchisee can be avoided simply by postponing the nonrenewal or termination of the franchise to a time subsequent to the title closing." Dissent op. at 253; see also id. at 258 ("The majority opinion, however, holding that a sale-without-offer followed by expiration of an underlying lease makes nonrenewal reasonable, allows franchisors to completely dispense with the bona fide offer requirement."). We do not so hold. Instead, we hold that a franchisor that fails to offer the property to its franchisee before selling to another is liable to the franchisee for damages, but may not be enjoined from the sale, provided the transaction is made in good faith and in the normal course of business, with the requisite notice.

Id. at 253 n.8 (emphasis supplied). Although the highlighted language in the quoted footnote from Patel V

28

purports to "hold" that a franchisor that fails to offer its property to the franchisee before selling "is liable" without regard to the franchisor's good faith (or even an inquiry into the objective reasonableness of the nonrenewal)-- in other words that there is a "sale-leaseback offer requirement" implicit in the PMPA which nullifies the lease-expiration defense set forth in S 2802(c)(4) -- we conclude that that statement is dictum, and we decline to follow it.10

The issue before the Court in Patel V was "whether injunctive relief is still an available remedy for[the Patels] against [Sun]." 63 F.3d at 249. To that end, the Court determined that S 2805(e)(1) barred the preliminary injunction the Patels sought because Sun had acted in good faith and in the ordinary course of business. See id. at 252. Nothing in Patel V's footnote eight was integral to our holding there; in fact, the footnote itself appears to have been drafted in response to criticism from the dissent about issues that were not directly before us. A statement such as this is dictum. See Sarnoff v. American Home Prods. Corp., 798 F.2d 1075, 1084 (7th Cir. 1986) (defining dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding -- that, being peripheral, may not have received the full and careful attention of the court that uttered it").11 Based upon these circumstances, combined with our observation that the majority in Patel V engaged in no analysis of the Patels' novel claim for damages under S 2802 (in contrast with its detailed discussion of the availability of injunctive relief), we do not regard the highlighted language in footnote eight of Patel V as controlling.

_____

10. We note that Judge Scirica, who was a member of that panel, joins in this opinion.

11. As dictum, there are many reasons why we should not give it weight here: (1) it may not have been as fully considered as it would have been if it were essential to the outcome; (2) sloughing it off in a new opinion will not affect the analytic structure of the original opinion; and (3) the dictum may lack refinement because it was not honed through the fires of an adversary presentation. See United States v. Crawley, 837 F.2d 291, 292-93 (7th Cir. 1988).

III.

In conclusion, we find that Sun's decision to create an underlying lease through a sale-leaseback that took place after the creation of the business relationship was subject to an "in good faith and the normal course of business" inquiry under SS 2802(b)(2)(C) and 2802(c)(4) before it could be exempted from liability under the PMPA. We also conclude that Sun has already satisfied that test because the Patels have adduced insufficient evidence of bad faith. The judgment of the district court will therefore be affirmed.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

30